# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00656-CV

**Linda Cloud, Appellant**

**v.**

**Mike McKinney and Kathy Walt, Appellees**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. GN203670, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## O P I N I O N

Our opinion and judgment issued on August 30, 2006, are withdrawn, and the following opinion is substituted.

Shortly after a lottery commission employee filed a complaint against the lottery commissioner (Walter Criner), the governor's former chief-of-staff (Mike McKinney) set up a meeting with the executive director for the lottery (Linda Cloud). When Cloud was later questioned by a reporter about the allegations against Criner, she told the reporter that she did not know about the allegations against Criner and that she had not discussed the matter with anyone in the governor's office. However, when she later testified before the Sunset Commission, Cloud stated that she had discussed the allegations against Criner with "the governor's office." The reporter then questioned McKinney and other employees of the governor's office regarding the meeting between Cloud and McKinney. After reading their published answers, Cloud filed a defamation lawsuit against

McKinney. In addition, Kathy Walt, a spokesperson for Governor Perry's re-election campaign, told a reporter, in response to a question about the defamation suit, that Cloud had lied repeatedly. Consequently, Cloud added Walt to her defamation suit. The district court granted summary judgment in favor of Walt on the ground that there was no evidence that she made the statement with actual malice. The court also granted summary judgment in favor of McKinney on the grounds that he was immune from suit under the doctrines of sovereign immunity and official immunity. We will affirm the judgments of the district court.

## BACKGROUND

A lottery employee accused Criner of making improper sexual comments and contact. After the claim was made, the lottery commission's general counsel and another lottery employee informed Cloud about the complaint. Shortly thereafter, McKinney set up a meeting with Cloud. McKinney contends that, during the meeting, they discussed Criner's resignation and the need to replace Criner. Cloud alleges that McKinney also discussed the details of the allegations against Criner and that McKinney told her to keep the discussion secret in a manner that caused her to feel threatened.

Several months after meeting with McKinney, Cloud was called to testify before the Sunset Commission. At the hearing, she testified that she first became aware that there were allegations against Criner after members of her staff informed her of them. She also stated, in response to a question about whether she informed the governor's office of the allegations, that she "had a conversation with the governor's office." Finally, contrary to her allegations in this case, she testified that no one had ever instructed her not to discuss the allegations against Criner.

2

Both before and after Cloud testified at the hearing, Jay Root, a reporter, questioned Cloud about the allegations against Criner and subsequently published more than one newspaper article concerning the Criner allegations. In his first article, Root wrote that Cloud declared that she had not been informed about the allegations and that she had not discussed them with McKinney. In a subsequent article, Root wrote that Cloud initially stated that she had first indicated that she was unaware of the allegations against Criner and that she had not discussed the matter with anyone in the governor's office but then told a different story when she testified before the Sunset Commission. The article also related that when asked about the inconsistent stories and why she previously stated that she had not talked to anyone in the governor's office, Cloud stated that the topic was sensitive and that "[i]t put me in a bad position" and "[i]t wasn't something I felt comfortable talking about." In addition, the article commented that in response to a question regarding whether anyone in the governor's office had pressured her to remain silent, Cloud responded "absolutely not."

After writing these articles, Root questioned McKinney at a press conference called for an unrelated matter, asking McKinney about the allegations against Criner and about his meeting with Cloud. In a subsequent article, Root wrote:

> Cloud's statements [to the Sunset Commission] were in direct conflict with those made by . . . McKinney. Records obtained by the *Star-Telegram* show that McKinney and Cloud met on Feb. 27 and discussed Criner's resignation, but McKinney said Wednesday the allegations never came up.
>
> "I wouldn't do that," McKinney said. "Frankly, she's hired help. He was on the board. No matter what, I wouldn't talk to her about that."

3

After the articles were published, Cloud resigned from her job, stating that she felt that her integrity had been impugned by McKinney's denial of her assertion that they had discussed the allegations against Criner. Around that time, in two other articles concerning the Criner allegations and Cloud's resignation, two employees of the governor's office—Gene Acuna and Ray Sullivan—were credited with stating that the Criner allegations were not discussed in the meeting between Cloud and McKinney. After resigning, Cloud filed a defamation suit against McKinney alleging that his statements were defamatory because they accused her of lying under oath before the Sunset Commission.

After Cloud filed suit, another newspaper article was written by a different reporter, discussing Cloud's defamation claim against McKinney. The reporter asked Walt, a spokesperson for Governor Perry's re-election campaign, to comment on the defamation suit against McKinney. The article stated that Walt "said the sworn statement is a lie" and quoted her as saying that Cloud had "'lied repeatedly.'" The article also stated that, when she made these comments, Walt noted Cloud's previous statement to Root that the governor's office had not pressured her to lie regarding the allegations against Criner. After the article was published, Cloud amended her petition to add Walt to the suit.

McKinney and Walt both filed motions for summary judgment, asserting that they were entitled to relief under both traditional and no-evidence summary judgment standards. In her motion, Walt contended that Cloud was unable to prove the necessary elements for a defamation claim. Specifically, she argued that Cloud could not prove that the allegedly defamatory statement was false or made with actual malice, arguing that a finding of actual malice was necessary because

4

Cloud was a public official. Although she primarily asserted no-evidence summary judgment motion grounds, Walt also attached summary judgment evidence and argued that she had proven the truth of her statements. In his motion for summary judgment, McKinney asserted that he was immune from suit under the doctrines of sovereign immunity and official immunity. Further, McKinney contended that Cloud could not prove the necessary elements for maintaining a defamation claim. The district court granted the motions in separate orders. In the first order, the court concluded that there was no evidence of "actual malice" on Walt's part. In the second order, the court concluded that McKinney was protected by the doctrine of sovereign immunity to the extent that he was sued in his official capacity and by the doctrine of official immunity to the extent that he was sued in an individual capacity. Cloud appeals, contending that the trial court erred by granting the motions for summary judgment.

### STANDARD OF REVIEW

When a trial court specifies the grounds upon which summary judgment is granted, summary judgment can only be affirmed if the grounds relied upon are meritorious; otherwise, the case must be remanded. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 381-82 (Tex. 1993). A traditional motion for summary judgment must be granted if the evidence shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tex. R. Civ. P. 166a(c); *Little v. Texas Dep't of Crim. Justice*, 148 S.W.3d 374, 381 (Tex. 2004). The movant bears the burden of proving that there is no genuine issue of material fact. *See* Tex. R. Civ. P. 166a(c); *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).

In reviewing a motion for summary judgment, an appellate court must take the nonmovant's evidence as true, indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in favor of the nonmovant. *Little*, 148 S.W.3d at 381. If a defendant conclusively negates at least one element of the plaintiff's cause of action, then he is entitled to summary judgment. *Id.*

A party may move for summary judgment under rule 166a(i) on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. Tex. R. Civ. P. 166a(i). Unless the nonmovant produces summary-judgment evidence raising a genuine issue of material fact on the challenged elements, the court must grant the motion. *Id.* The reviewing court must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

## DISCUSSION

**Immunity**

Before addressing the merits of this case, we need to resolve an issue raised by the parties concerning the capacity in which McKinney was sued. A plaintiff may sue a governmental

employee in his official capacity, in an individual capacity, or in both capacities. *Nueces County v. Ferguson*, 97 S.W.3d 205, 213 (Tex. App.—Corpus Christi 2002, no pet.); *Denson v. Texas Dep't of Criminal Justice-Inst. Div.*, 63 S.W.3d 454, 460 (Tex. App.—Tyler 1999, pet. denied). A suit against a governmental employee in his official capacity is essentially a suit against the governmental agency the person works for, rather than a suit against the individual. *See City of Hempstead v. KMIEC*, 902 S.W.2d 118, 122 (Tex. App.—Houston [1st Dist.] 1995, no writ). On the other hand, a suit against a governmental employee in his individual capacity seeks to impose personal liability on the individual. *Ferguson*, 97 S.W.3d at 214; *see City of San Angelo Fire Dep't v. Hudson*, 179 S.W.3d 695, 703 (Tex. App.—Austin 2005, no pet.).

The capacity in which the individual is sued affects the defenses to liability that may be raised. *Jackson v. Stinnett*, 881 S.W.2d 498, 500 (Tex. App.—El Paso 1994, no writ). If an individual is sued in his official capacity, the employee may raise any defense that would be available to his employer, including the defense of sovereign immunity. *Texas Parks & Wildlife Dep't v. E.E. Lowrey Realty, Ltd.*, 155 S.W.3d 456, 458 (Tex. App.—Waco 2004, pet. filed); *KMIEC*, 902 S.W.2d at 122. Individuals sued in their individual capacity, however, may not rely on the defense of sovereign immunity but may raise the defense of official immunity. *Ferguson*, 97 S.W.3d at 215; *Gonzalez v. Avalos*, 866 S.W.2d 346, 349 (Tex. App.—El Paso 1993, writ dism'd w.o.j.).

Cloud's petition does not explicitly state whether she was suing McKinney in his official or in his individual capacity. However, on appeal, Cloud asserts that "it is clear that

McKinney was sued individually. Nowhere in Cloud's pleadings or discovery does she attempt to sue McKinney in his capacity as a state official."[1] Accordingly, we will limit our discussion to the defense of official immunity.

**Cloud's Claims Against McKinney**

Cloud insists that she was unaware of the details of the allegations against Criner until she met with McKinney. In her affidavit, she claims that, during their meeting, she told McKinney that she did not know the details of the allegations. She further asserts that, in response to her statement, McKinney informed her, "in some detail," about the allegations. Specifically, she asserts that McKinney told her that "if [Criner] had simply not grabbed [the employee], there would not be an issue." She insists that, after making those statements, McKinney falsely denied discussing the allegations on three separate occasions.

The first incident she complains of occurred when McKinney made the following statement at an unrelated press conference in response to a question by Root: "I wouldn't do that . . . . Frankly, she's hired help. He was on the board. No matter what, I wouldn't talk to her about that." The second and third incidents occurred when McKinney allegedly made statements to his

---

[1] McKinney, on the other hand, asserts that the course of proceedings demonstrates that Cloud sued him in his official, not his individual, capacity. *See Nueces County v. Ferguson*, 97 S.W.3d 205, 215 (Tex. App.—Corpus Christi 2002, no pet.) (when petition does not specify what capacity government official sued in, courts look at the "'course of proceedings'" to determine nature of suit (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985))). In support of this assertion, McKinney points to an affidavit filed by Cloud stating that she had discussed Criner's allegations with the "Governor's office" and to a statement Cloud made in her deposition admitting that McKinney was acting in his official capacity when he made the statements at issue in this lawsuit.

aides, Acuna and Sullivan, indicating that the allegations against Criner had not been discussed. These statements were then relayed to reporters and printed in two separate articles.

Cloud insists that because she testified before the Sunset Commission that she had discussed the allegations with McKinney, McKinney's three statements contradicted her sworn testimony and, therefore, constituted defamation per se because they accused her of lying under oath. *See Knox v. Taylor*, 992 S.W.2d 40, 50 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding that statement is defamatory per se if "it injures a person in his office, business, profession, or occupation"). She further insists that because McKinney informed her of the allegations against Criner at their meeting, he knew that the statements he made to Root, Acuna, and Sullivan were false when he made them.

Before addressing the merits of the case, we note that Cloud has failed to produce any evidence linking Sullivan's statement to McKinney. In an article, Sullivan was credited with saying that "there had been no mention of the allegations against" Criner. Although Cloud contested the accuracy of the statement, she provided no evidence demonstrating that Sullivan made the statement after receiving information from McKinney. In fact, Cloud's affidavit and deposition seem to indicate that Sullivan's statement was the result of his own direct, first-hand knowledge: in her affidavit, Cloud specified that Sullivan was in the room for part of the meeting between her and McKinney; and in her deposition, she characterized Sullivan "as a witness to some of the conversation in" McKinney's office.

As the plaintiff, Cloud has the burden of proving that McKinney made a defamatory statement to Sullivan. *See* Tex. R. Civ. P. 166a. She has failed to meet this burden.

9

As for the remaining statements, we must determine whether McKinney is protected from liability by the doctrine of official immunity for the statements he made at the press conference and to Acuna. Official immunity is an affirmative defense that shields public employees from personal liability in order to encourage governmental employees to vigorously perform their jobs. *Telthorster v. Tennell*, 92 S.W.3d 457, 460-61 (Tex. 2002); *see University of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). The purpose of the defense is to "protect public officers from civil liability for conduct that would otherwise be actionable." *Chambers*, 883 S.W.2d at 653-54. As an affirmative defense, the burden is on the defendant to establish the elements of the defense. *Id.* at 653. A governmental employee is entitled to official immunity if he is (1) performing discretionary duties that are (2) within the scope of his authority and (3) performed in good faith. *Clark*, 38 S.W.3d at 580; *Chambers*, 883 S.W.2d at 653.

*Discretionary Duty*

In determining whether McKinney is immune, we must first determine whether he was performing a discretionary duty when the allegedly inappropriate actions occurred. Discretionary actions are entitled to protection under official immunity, but ministerial actions are not. *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 425 (Tex. 2003). An action is ministerial if it is one that is defined with such precision that no discretion or judgment is left for the actor. *Id.* In other words, if the official has to commit the action without any "choice in complying, the act is ministerial." *Id.* However, if the action requires "personal deliberation, decision, and judgment," then the action is discretionary. *Id.*

10

Cloud does not contest that the actions she complains of were discretionary in nature. Moreover, formulating a response to a question inherently involves personal deliberation, decision, and judgment and is, therefore, a discretionary act.

*Scope of Authority*

We must next determine whether McKinney was acting within the scope of his authority when he made the statements at issue. If an official is engaging in a duty generally assigned to him, then the official is acting within the scope of his authority. *Id.* at 424.

In his motion for summary judgment, McKinney submitted the affidavit of Donna White, the Director of Administration for the Governor of Texas, which described the duties of the chief-of-staff. As part of his job, the chief-of-staff is charged with the burden of acting as the representative of the governor's office in interactions with "all federal, state and private entities" and as a liaison to "the general public to exchange information [and] address concerns." Accordingly, his job requires him to communicate with the public and the press regarding objectives and operations of the governor's office and regarding matters affecting the entire state.

It was in this capacity that McKinney met with Cloud to discuss the resignation of the lottery commissioner and then later made the allegedly defamatory statements. The statements he made concerned the circumstances surrounding the resignation of a high-ranking public official—a matter of great public interest—and were given in response to inquiries by reporters seeking to inform the public about the issue. Making statements concerning personnel matters falls well within the chief-of-staff's official duties. Therefore, McKinney was acting within the scope of his authority when he made the statements at issue in this case.

11

*Good Faith*

Finally, we must determine whether McKinney has demonstrated that the allegedly improper actions were performed in good faith. Courts examine "good faith" in this context against a standard of objective legal reasonableness, without regard to the employee's subjective state of mind. *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997). To establish good faith, the employee must show that a reasonably prudent employee, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred. *Telthorster*, 92 S.W.3d at 465; *see Chambers*, 883 S.W.2d at 656. It is not necessary that the employee prove that it would have been unreasonable to take different action nor that all reasonably prudent officials would have acted as he did. *Perry v. Grenias*, 95 S.W.3d 683, 697 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). A plaintiff attempting to controvert the employee's summary-judgment evidence on good faith must show that no reasonable person in the employee's position could have thought that the facts justified the employee's actions. *Id.* at 697.

We first address McKinney's statements at the press conference. To determine whether McKinney is entitled to the protection of official immunity for making this statement, we must consider the circumstances in which it was made. *See Telthorster*, 92 S.W.3d at 465 (courts must consider circumstances of action); *Ezrailson v. Rohrich*, 65 S.W.3d 373, 376 (Tex. App.—Beaumont 2001, no pet.) (holding that in defamation case, courts should consider statement in context it was given). In her deposition, Cloud admitted that she did not know the specific question that was asked by Root, nor did she know the context in which McKinney's statement was made. The only evidence presented concerning the surrounding circumstances comes

12

from the uncontroverted testimony by McKinney in his deposition. *See* Tex. R. Civ. P. 166a(c) (providing that summary judgment may be based on uncontroverted testimony of interested party). In his deposition, he testified that he made the allegedly defamatory statements at a press conference called for a different topic and that the statements were made in response to an "unexpected" question from Root as McKinney was leaving the podium. When McKinney was asked about the press conference, the following exchange occurred:

> A: I never said the allegations didn't come up. That's Mr. Root's writing. It's not in quotes.
>
> Q: What were you referring to when you said, "I wouldn't do that. Frankly, she's hired help. He was on the board. No matter what, I wouldn't talk to her about that"? What were you referring to?
>
> A: It was in response to a question from Mr. Root.
>
> Q: What was the question?
>
> A: The question from Mr. Root was unexpected. We were talking about—I mean, I was at a press conference about homeowners' insurance or something, something totally unrelated, and frankly hadn't thought about it in six or seven months.
>
> And he asked me—the question directly was, "Did Linda Cloud lie to Chairman Gallegos?" That was the question. And again, I mean, I was walking off at the time and he asked me that question. "Did Linda Cloud lie to Chairman Gallegos?"
>
> And I said, "I don't know. What did she say?"
>
> And he said, "She said you were the one who told her about the Walter Criner's allegations."
>
> And I said, "I didn't do it and wouldn't do that."
>
> . . . .

13

A: He asked me if she lied is what he asked me, and I truthfully answered I didn't know.

Given the preceding, we must determine whether McKinney has shown that a reasonably prudent employee, under the same circumstances, could have believed that his response to the question of whether he was the individual who told Cloud about the allegations was justified. In her sworn affidavit, Cloud stated that she first learned of the allegations against Criner from two employees working for the lottery. This assertion is confirmed by Cloud's testimony before the Sunset Commission; in response to a question about how she learned of the allegations, Cloud testified, "My security director and my internal counsel made me aware of it."

In light of this, a reasonable employee could have believed that the response given to Root's question was justified. The response could reasonably be interpreted as simply an assertion that he was not the individual who first told Cloud about the allegations, which, according to Cloud's own sworn testimony, was a true statement.

Because McKinney satisfied his burden, the burden shifted to Cloud to produce evidence that no reasonable official in McKinney's position could have believed that his statement was justified. In support of her assertions, Cloud refers to various statements made by McKinney in his deposition, admitting that "the subject of the allegations against Criner did come up" during the meeting on two occasions: when he asked Cloud at the beginning of their meeting if she had heard about the incident involving Criner, and when he told her that Criner "was guilty of poor judgment—in fact, I said he's guilty of poor judgment until he grabbed his arm—grabbed her arm, and then I don't know what he's guilty of." Although Cloud stated that McKinney "gave [her] the details" and "began talking in some detail about the complaint" against Criner, she only lists two

14

statements relating to the allegations in her affidavit: (1) the statement in which McKinney stated Criner was guilty of poor judgment, and (2) a statement McKinney allegedly made in which he said that he did not believe the allegations against Criner. However, this evidence does not meet the burden of showing that a reasonable official could not have believed that McKinney's response was justified in light of the question asked by Root: whether McKinney was the individual who told Cloud about the allegations against Criner.

Even if McKinney's statements were interpreted in the manner suggested by Cloud—as a denial that McKinney ever mentioned the allegations to Cloud—McKinney's statements could not be viewed as accusing Cloud of perjury. In her testimony before the Commission, Cloud made no mention of McKinney. Although she did mention "a conversation with the governor's office" twice, both statements were made in response to a question about whether *Cloud had informed the governor's office* about the allegations. Accordingly, McKinney's responses do not contradict any statement made by Cloud before the Sunset Commission.

We now address the statement made to Acuna. In response to a question from a reporter about the allegations against Criner, Acuna stated, "It was not discussed." The context of this statement was explained by Acuna in his deposition. In his testimony, he explained that Root called him to get a response to Cloud's assertion that the allegations had been discussed during the meeting between Cloud and McKinney. Before giving a comment, Acuna checked with McKinney, who told Acuna that "it was not discussed." Acuna then relayed McKinney's comments to Root, and the comments were subsequently published in an article.

As described previously, it is necessary to consider the circumstances in which the allegedly defamatory statement was made in order to determine whether McKinney is entitled to the

15

protection of official immunity. In his deposition, McKinney stated that the purpose of the meeting with Cloud was to inform her that Criner had resigned and to talk about finding a replacement. He testified that they talked about how Criner had prepared a letter of resignation and would quickly be resigning from his position. He further testified that it was going to be his job to search for a suitable replacement for the commissioner and that he asked Cloud for her input. Specifically, he wanted input regarding what qualifications would be the most helpful in a replacement. Additionally, he said that they talked about the lottery's general counsel because he was concerned that Cloud might not be getting good legal advice. Finally, as mentioned before, he admitted that the subject of the allegations came up on two occasions.

Cloud's affidavit confirms that many of these topics came up during the meeting, and she admitted in her deposition that the "bulk" of the meeting consisted of talking about topics other than the details of the allegations against Criner. Further, Cloud related that she "remained silent, listening" in response to McKinney's statements and that she actually said very "little" during the meeting. She also admitted that the only "substantive exchange of information" concerning the allegations was McKinney's communication that Criner had grabbed the employee's arm.

In light of the preceding evidence, we conclude that a reasonably prudent official, in the same circumstances, could have believed that stating that the allegations were not "discussed" was justified. The word "discuss" means "[t]o speak together about" and "involves close examination of a subject with interchange of opinions, and need not imply disagreement." *American Heritage Dictionary of the English Language, New College Edition* 377 (1980). Both parties agree that the main topics of conversation during the meeting did not involve the allegations against Criner. Moreover, when describing her reaction to McKinney's allegedly defamatory

16

statements, Cloud characterizes herself as a recipient of information, not an active participant in a conversation. Because McKinney satisfied his burden, the burden shifted to Cloud to produce evidence that no reasonable official in McKinney's position could have believed that his statement was justified. In support of her claim, Cloud refers to the evidence previously described in which McKinney admitted that the subject of the allegations came up during the meeting and to the statements in her affidavit claiming that McKinney mentioned the allegations on more than one occasion.

In light of the definition of the word "discuss," Cloud's characterization of her participation in the meeting, and the descriptions of the meeting, we cannot conclude that these assertions constitute evidence that it would not have been possible for a reasonable employee to conclude that, under the circumstances, the statement "the allegations were not discussed" was justified.

For all the reasons previously given, we conclude that McKinney proved that he acted in good faith and that Cloud failed to raise a fact issue with respect to good faith. Because McKinney has proved all the elements of official immunity, we hold that he is immune from suit and cannot be held liable for the allegedly defamatory statements he made. Therefore, we affirm the district court's grant of summary judgment on the grounds of official immunity.

**Walt's Summary Judgment**

In her second issue, Cloud asserts that the district court also erred in granting Walt's motion for summary judgment on the ground that there was no evidence indicating that Walt made

the statement with actual malice. Cloud asserts that by stating that Cloud had "lied repeatedly" and telling a reporter that her sworn statement was a lie, Walt accused Cloud of perjury and defamed her. Cloud argues that, even assuming she was a public official at the time the statement was made, Walt made the statements with actual malice.

In order to succeed in a defamation claim, a plaintiff must prove that the defendant "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). In this context, actual malice refers to the defendant's attitude toward the truth of what he said. *See id.* at 573. Actual malice means that the defendant made the statement knowing that it was false or with reckless disregard about whether the statement was false or not. *HBO v. Harrison*, 983 S.W.2d 31, 36 (Tex. App.—Houston [14th Dist.] 1998, no pet.). To establish recklessness, the plaintiff must prove the defendant "entertained serious doubts as to the truth of his publication." *WFAA-TV*, 978 S.W.2d at 574.

Two prerequisites must be met for the actual malice standard to apply. First, the plaintiff must be a public official for the purposes of the published statements, and second, the allegedly defamatory statements must relate to the plaintiff's official conduct. *HBO*, 983 S.W.2d at 36. Walt's statements referred to actions that Cloud had engaged in as the Lottery Director, and, therefore, satisfied the second requirement. Regarding the first requirement, the determination of whether an individual is a public official is a question of law for the court to decide. *See WFAA-TV*, 978 S.W.2d at 571. Not all governmental employees qualify as public officials, and there is no specific test for determining whether an individual is a public official. *HBO*,

18

983 S.W.2d at 36. However, public official status does apply to governmental employees "'who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs'" and to an employee holding an office of "'such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees.'" *Id.* (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 85-86 (1966)).

The executive director of the lottery commission has "broad authority" and exercises control and supervision over all lottery games in Texas. Tex. Gov't Code Ann. § 466.014(a) (West 2004). As part of her job, the director has enforcement and collection powers and has the authority to (1) hire people to work for the commission, including security officers; (2) enter into contracts for supplies; (3) employ a certified accountant to audit lottery transactions and accounts; (4) investigate violations of the Lottery Act; and (5) maintain a security department and appoint someone to run it. *Id.* §§ 466.014(b), (c); .017(a); .019(a), (b); .020(a), (b) (West 2004). Based on the broad authority given to the position, we conclude that the executive director has substantial responsibility over the conduct of governmental affairs and is, therefore, a public official. *Cf. Foster v. Laredo Newspapers Corp.*, 541 S.W.2d 809, 814 (Tex. 1976) (holding that although county surveyor was in lower echelon of governmental employees, he is still considered public official); *Johnson v. Southwestern Newspapers Corp.*, 855 S.W.2d 182, 186-87 (Tex. App.—Amarillo 1993, writ denied) (holding that teacher who was also athletic director is considered public official); *Villarreal v. Harte-Hanks Communications, Inc.*, 787 S.W.2d 131, 133-35 (Tex. App.—Corpus Christi 1990, writ denied) (holding that child protective services specialist, whose duties consisted of investigating allegations of child abuse, is considered public official).

19

Cloud asserts that, prior to making the allegedly defamatory statements, Walt did nothing to determine the truthfulness of her statements and, therefore, made the statements with reckless disregard as to their truth. Specifically, Cloud contends that Walt did not discuss the defamation suit with the individuals who were present during the meeting. Further, Cloud argues that, because the statements in her affidavit were true, Walt's statement was false and defamatory. As proof of this assertion, Cloud refers back to the evidence described in the previous section as proof that the Criner allegations were discussed in her meeting with McKinney.

However, the fact that Walt did not check with McKinney or Cloud prior to making the statements does not mean that Walt made the statement knowing that it was false or with reckless disregard as to the truth of the statement. In her affidavit, Walt stated that her statements were based in part on Cloud's previous admissions that she had lied. It is undisputed that Cloud lied to Root when she told him how she learned of the allegations against Criner. In her affidavit, Cloud admits that she told Root that she learned of the allegations against Criner by reading about them in the newspaper, which was a false statement.

Additionally, the article concerning the defamation suit against McKinney stated that, when Walt made the statements, she also noted that Cloud had previously told Root that no one had pressured her to lie about the Criner allegations—a statement Cloud also made to the Sunset Commission. However, these statements are inconsistent with statements in Cloud's petition and in her affidavit that McKinney had instructed her not to discuss the matter.

Further, none of the evidence referenced relates to whether Walt made the allegedly defamatory statements with actual malice or relates to Walt's state of mind when she made the

20

statements. Cloud did not depose Walt and does not contend that she was deprived of the opportunity to obtain evidence regarding Walt's state of mind.

Given that this was a no-evidence summary judgment, that Cloud failed to provide evidence regarding Walt's mental state, that Cloud admitted lying to Root, and that statements in Cloud's affidavit are inconsistent with her testimony before the Sunset Commission, we cannot conclude that the district court erred when it granted the summary judgment motion on the ground that there was no evidence Walt's statements were made with actual malice. Accordingly, we affirm the no-evidence summary judgment granted in favor of Walt.

## CONCLUSION

Because we have concluded that the district court did not err in granting a traditional summary judgment in favor of McKinney or in granting the no-evidence summary judgment in favor of Walt, we affirm the judgments of the district court.

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed on Motion for Rehearing

Filed: May 18, 2007