*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



# OPINION

No. 04-10-00311-CV

**ZYZY CORPORATION**,
Appellant

v.

Gloria **HERNANDEZ**,
Appellee

From the 365th Judicial District Court, Maverick County, Texas
Trial Court No. 07-12-23065-MCVAJA
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by:    Steven C. Hilbig, Justice

Sitting:       Karen Angelini, Justice
               Sandee Bryan Marion, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:  January 26, 2011

AFFIRMED

In this interlocutory appeal, ZYZY Corporation, publisher of the *Eagle Pass News-Guide*, a newspaper of general circulation in Maverick County, complains of the trial court's order denying its motion for summary judgment in a libel suit brought by Gloria Hernandez. *See* TEX. CIV. PRAC. & REM. CODE ANN § 51.014(a)(6) (West 2008). We hold Hernandez's suit is not barred by limitations and that ZYZY did not establish as a matter of law that Hernandez is a public figure. Accordingly, we affirm the trial court's order.

**BACKGROUND**

The lawsuit arises out of an article published in the *News-Guide* on April 27, 2006. The article reported on a hearing held April 26, 2006, before the Tribal District Court for the Kickapoo Traditional Tribe of Texas. That proceeding concerned a long-standing dispute about who were the legitimate and duly elected leaders of the tribe. During the hearing, the plaintiffs called Hernandez to testify about some of the facts surrounding the dispute. Hernandez, who is not a member of the tribe, testified she was hired to be legal counsel for the tribe in October 2002, and was on retainer at the time of the hearing. In response to a question about how much of her legal practice is devoted to work for the tribe, Hernandez testified, "I make roughly about ten percent of my income from the tribe."

The day after the hearing, the article on the front page of the *News-Guide* contained the subheadline, "Gloria Hernandez admits she's skimming 10% of casino profits off the top." The article stated in part:

> The most damning of testimony came when Hernandez admitted on the stand that she rakes off a 10% share of Lucky Eagle Casino profits for her services to the handful of remaining Kickapoo insurgents. This admission is a clear cut violation of National Indian Gaming Commission rules and regulations which require approval of any management contract by an outsider hired to oversee an Indian casino operation. And Hernandez leaves little doubt she intended to defraud to [sic] the federal governmental agency when she has never listed herself as anything but a legal representative to the Kickapoo Tribe of Texas.

Hernandez filed a libel suit against ZYZY in Comal County on Friday, April 27, 2007. Hernandez filed an identical petition in Bexar County on Monday, April 30, 2007. The Comal County suit was later dismissed for want of prosecution, and the Bexar County suit was transferred to Maverick County.

ZYZY filed a motion for summary judgment in the Bexar/Maverick County case, arguing Hernandez's suit is barred by the statute of limitations and that the summary judgment evidence established an absence of malice as a matter of law. The trial court denied the motion and this appeal ensued.

## LIMITATIONS

The parties agree that the one year statute of limitations[1] ended on Friday, April 27, 2007, and that the Comal County suit was timely filed. Hernandez contends the Bexar County filing was also timely because the Bexar County District Clerk's office was closed April 27, 2007 for the Battle of Flowers holiday. Hernandez argues that, pursuant to section 16.072 of the Texas Civil Practice and Remedies Code, the last day of the limitations period for filing in Bexar County was extended to the following Monday – the next day the Bexar County District Clerk's Office was open and the date her suit was filed.

Section 16.072 provides:

> If the last day of a limitations period under any statute of limitations falls on a Saturday, Sunday, or holiday, the period for filing suit is extended to include the next day that the county offices are open for business.

TEX. CIV. PRAC. & REM. CODE ANN. 16.072 (West 2008). The term "holiday," as used in the limitations statute, includes a day when the clerk's office for the court in which the case is filed is officially closed. *Martinez v. Windsor Park Dev. Co.*, 833 S.W.2d 950, 951 (Tex. 1992). The parties agree the Bexar County courthouse was officially closed on the last day of the limitations period, and that the Battle of the Flowers is a "holiday" within the meaning of the statute.

ZYZY argues Hernandez may not invoke section 16.072 to extend the limitation period because, having timely filed her suit in Comal County, Hernandez "was not at risk of losing the

---

[1] An action for libel must be brought not later than one year after the cause of action accrues. TEX. CIV. PRAC. & REM. CODE ANN. § 16.002(a) (West 2002).

final day of [her] limitations period in this case." *See Lowe v. Rivera*, 60 S.W.3d 366, 368 (Tex. App.—Dallas 2001, no pet). In *Lowe*, the last day of the limitations period was President's Day. Assuming Dallas County offices were closed on President's Day, Lowe waited until the following day to file his petition. *Id*. at 367. However, Dallas County offices, including the clerk's office, were open on President's Day. *Id.* The trial court granted the defendant's motion for summary judgment on limitations grounds. *Id.* On appeal, Lowe argued that because the day limitations expired was an official holiday, his limitations period was extended one day. *Id.* at 368. The court of appeals rejected Lowe's argument, stating that "[r]ead as a whole, the section clearly addresses the situation that arises when the county's offices are *not* open for business on the last day of the limitations period." *Id.* at 369. The court further explained that Lowe's

> reading of section 16.072 would apply a savings provision to a date that needed no saving. Appellant was not at risk of losing the final day of his limitations period in this case: the courthouse and the clerk's office were open for business on February 21, 2000. He could have filed his petition on the last day of his limitations period. To apply a statute extending the limitations period beyond a date when the courthouse is already open is patently absurd. It is reasonable, instead, to construe that statute-given its purpose and its language-to operate only when the plaintiff is unable to file his petition on the date his limitations period expires.

*Id.* at 366 (citations omitted). Unlike the courthouse in *Lowe*, the Bexar County courthouse was closed on the last day of Hernandez's limitations period. ZYZY contends that the rationale of Lowe nevertheless bars Hernandez's claim because she *was* able to file her petition on the date her limitations period expired, albeit in Comal County.

We decline to engraft onto the statute a prefaratory clause to the effect of, "Unless suit has been or could be timely filed in another county, …" Were we to adopt ZYZY's position, plaintiffs facing a closed clerk's office on the last day of limitations would be required to

investigate whether the clerk's office in any county with arguable venue was open and file suit in that county, a result section 16.072 clearly does not require.

ZYZY also argues that section 16.064 of the Civil Practice and Remedies Code, rather than section 16.072, controls when there is a "second filing of the same action." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.064 (West 2008).[2] ZYZY then contends the Bexar County suit is not saved by section 16.064 because the Comal County suit was not dismissed for want of jurisdiction, as required by that section. We again disagree with ZYZY's construction of the statutes. Nothing in the language of section 16.072 limits its application to situations in which there is only one filing. Further, section 16.064, entitled "Effect of Lack of Jurisdiction," plainly sets out the rule to be applied to a second suit, filed after the first is dismissed for lack of jurisdiction. That is not this case.

We reject Lowe's arguments and apply the plain language of section 16.072, which extended the time for filing suit in Bexar County until Monday, April 30, 2007. Accordingly, we

---

[2] Section 16.064 provides:

> § 16.064. Effect of Lack of Jurisdiction
>
> (a) The period between the date of filing an action in a trial court and the date of a second filing of the same action in a different court suspends the running of the applicable statute of limitations for the period if:
>
> > (1) because of lack of jurisdiction in the trial court where the action was first filed, the action is dismissed or the judgment is set aside or annulled in a direct proceeding; and
> >
> > (2) not later than the 60th day after the date the dismissal or other disposition becomes final, the action is commenced in a court of proper jurisdiction.
>
> (b) This section does not apply if the adverse party has shown in abatement that the first filing was made with intentional disregard of proper jurisdiction.

TEX. CIV. PRAC. & REM. CODE § 16.064 (West 2008).

hold the trial court did not err in denying ZYZY's motion for summary judgment on the ground Hernandez's suit is barred by the statute of limitations.

## LIMITED-PURPOSE PUBLIC FIGURE

In its second ground for summary judgment, ZYZY argued Hernandez is a limited-purpose public figure and the evidence established an absence of actual malice as a matter of law. To recover damages in a libel case against a media defendant, a general or limited-purpose public figure or public official must prove, by clear and convincing evidence, that the defendant published the statement with "actual malice." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). Because we hold ZYZY did not establish as a matter of law that Hernandez is a limited-purpose public figure, we address only that issue, and need not decide whether the summary judgment evidence conclusively negated actual malice.

### *Applicable Law*

In the defamation context, there are two types of public figures: (1) general-purpose public figures — people who "achieve such pervasive fame or notoriety that [they] become[ ] public figure[s] for all purposes and in all contexts;" and (2) limited-purpose public figures — people who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved . . . inviting attention and comment," who "inject[ ] [themselves] or [are] drawn into a particular public controversy . . . assum[ing] special prominence in the resolution of public questions" or "engag[ing] the public's attention in an attempt to influence its outcome." *Gertz*, 418 U.S. at 345, 351, 352. Whether a person is a public figure is a question of law. *Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

The Texas Supreme Court applies the three part test adopted by the Fifth Circuit to determine whether an individual is a limited-purpose public figure:

(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) the plaintiff must have more than a trivial or tangential role in the controversy; and

(3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*McLemore*, 978 S.W.2d at 571 (quoting *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433-34 (5th Cir. 1987)).

To decide whether a public controversy existed and to define its contours, the court "'must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.'" *McLemore*, 978 S.W.2d at 572 (quoting *Waldbaum v. Fairchild Pub., Inc.* 627 F.2d 1287, 1297 (D.C. Cir. 1980)). To determine whether an individual had more than a trivial or tangential role in the controversy, the court considers: "(1) whether the plaintiff actually sought publicity surrounding the controversy; (2) whether the plaintiff had access to the media; and (3) whether the plaintiff 'voluntarily engaged in activities that necessarily involve[d] the risk of increased exposure and injury to reputation.'" *McLemore*, 978 S.W.2d at 573 (citations omitted) (quoting *Brewer v. Memphis Pub. Co.*, 626 F.2d 1238, 1254 (5th Cir. 1980)). "'By publishing your views you invite public criticism and rebuttal; you enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition in the marketplace.'" *McLemore*, 978 S.W.2d. at 573 (quoting *Dilworth v. Dudley*, 75 F.3d 307, 309

(7th Cir.1996)). A lawyer does not become a public figure merely because he "undertake[s] to represent clients in difficult, unpopular, high profile, or sensational types of cases," or advocates for a famous or controversial client. *Spence v. Flynt*, 816 P.2d 771, 776-77 (Wyo. 1991), *cert. denied*, 503 U.S. 984 (1992). A lawyer representing a client in a very public controversy, but who does "not thrust himself into the vortex of [the] public issue, nor . . . engage the public's attention in an attempt to influence its outcome" does not, by virtue of the legal representation, make himself a public figure. *See Gertz*, 418 U.S. at 353.

### *The controversy*

ZYZY's summary judgment evidence included the reporter's record of the April 26, 2006 hearing and newspaper articles from the *Eagle-Pass News Guide*, its sister paper, the *Eagle Pass Sunday News*, the *San Antonio Express-News*, and the *Dallas Morning News*. This evidence reveals that the controversy that was the subject of the April 26, 2006 hearing was, in broad terms, the legitimacy of the leadership of the Kickapoo Traditional Tribe of Texas and the legitimacy of the court conducting the hearing.

The evidence reflects that in 2002, a group of tribal members ("the insurgents") who were dissatisfied with how the tribe was being governed decided to challenge those who had long led the tribe. According to a *Sunday News* article, in July 2002, Hernandez, a lawyer and not a member of the tribe, presented the tribal chairman a demand letter and recall petition on behalf of the insurgents. The article reported that the letter, signed by Hernandez, demanded that an election to recall the chairman be held within forty-five days, pursuant to the tribe's Constitution. The attached petition was signed by 141 tribe members and enumerated their grievances.

The tribe did not set a recall election, and in September 2002, 140 tribe members, represented by Hernandez, filed suit in state court, seeking to require the tribe to conduct a special election. The state court dismissed the suit for want of jurisdiction, and Hernandez testified her research convinced her there was no tribal court that could hear the dispute. The insurgents then unsuccessfully sought assistance from their elected representatives and various federal agencies.

According to the news reports and testimony at the April 2006 hearing, the insurgents concluded they had no other remedy and decided to conduct their own "vote of conscience" in "the traditional way." After the vote of conscience, held October 28, 2002, Raul Garza Sr. was removed as tribal chairman, and new leadership assumed power. Hernandez testified the new tribal council immediately hired her as the tribe's attorney. There followed several months of litigation with the old leadership and negotiations with the Bureau of Indian Affairs ("BIA"). During this time, a tribal court created under the old leadership, declared the election invalid.[3] However, by the end of November, the new tribal council installed after the vote of conscience had gained recognition from the BIA, and was governing the tribe. The news articles in the record reflect that Hernandez represented the tribe during the next several years in various matters, including negotiations with state and federal agencies and litigation concerning gaming and the tribe's casino.

Juan Garza, the tribal chairman at the time of the 2006 hearing, testified there had been several general elections since October 2002. Garza also testified the tribal council passed a resolution in November 2005, adopting a tribal code that provided for the creation of a tribal court. In April 2006, the tribe created the Tribal District Court for the Kickapoo Traditional Tribe of Texas, and appointed Senior Judge Don Morgan as judge of the court.

---

[3] Whether this tribal court had been duly created was a disputed issue at the April 2006 hearing.

In March 2006, Raul Garza Sr. and some of the other leaders who had been ousted in 2002, began efforts to conduct their own "vote of conscience." Tribal chair Juan Garza testified that after learning about the efforts to conduct the new initiative election, he and the other members of the tribal council filed suit in the newly created tribal court against the former tribal leaders. The suit alleged that no proper petition had been submitted and sought to enjoin the election, declare any orders of previous alleged tribal courts void, and declare the plaintiffs the legitimate and duly elected tribal council. The defendants filed a special appearance challenging the legitimacy of the court and its jurisdiction over them. The April 26, 2006 hearing before Judge Morgan was to address the plaintiffs' motion for a temporary injunction and the defendants' special appearance. Hernandez testified as a fact witness about the events surrounding the 2002 vote of conscience, the subsequent litigation and recognition, and the current effort to conduct an initiative election. At the conclusion of the hearing, the court held the previous tribal court was not legally created, any actions by a purported judge of that court were *ultra vires*, any defect in the election of the tribal council in 2002 had been rectified by subsequent elections, and the court had jurisdiction over the cause and the parties. The *Eagle Pass News-Guide* article that is the basis of the instant lawsuit, was published the next day.

### *Discussion*

The summary judgment evidence establishes that the controversy regarding the legitimacy of the tribal leadership was a public one, "both in the sense that people [were] discussing it and people other than the immediate participants in the controversy [were] likely to feel the impact of its resolution." *McLemore*, 978 S.W.2d at 571. The resolution of the April 2006 hearing affected not only the individual parties to the suit, but the entire Kickapoo Traditional Tribe of Texas, and determined who would control vast sums of casino revenues.

But to be considered a limited-purpose public figure for defamation purposes, one involved in such a public controversy must have more than a tangential role, must seek out publicity, try to influence the outcome of the controversy by publishing his views, or engage in activities that necessarily increase his exposure to injury to his reputation. *See Gertz*, 418 U.S. at 345; *McLemore*, 978 S.W.2d at 573.

ZYZY contends Hernandez played more than a trivial or tangential role in the dispute because she injected herself into the controversy beyond her role as an advocate for one side. The summary judgment evidence includes ninety-eight articles from ZYZY's two Eagle Pass papers that concern the Kickapoo and cover the period from July 28, 2002 through April 23, 2006. Approximately half of the articles mention Hernandez by name. In the articles from July through December 2002, covering the recall petition through BIA recognition of the new leadership, ZYZY's reporting of the events was somewhat neutral. When Hernandez was mentioned, it was in reference to legal matters, she was referred to as the attorney for those challenging the former leaders or for the tribe, and the context suggests she was responding to a reporter's inquiries about the status of various proceedings.

Beginning in February 2003, the tone of ZYZY's reporting changed significantly. Later articles refer to Hernandez as a "non-Indian outside agitator," a "dictator," and the "self-proclaimed heir to Kickapoo throne," and state she "orchestrated an illegal revolution," established "the insurgent tribal council" and "leads [it] by a nose ring." However, ZYZY did not present any summary judgment evidence supporting these characterizations. There is no evidence Hernandez led or "orchestrated" the 2002 vote of conscience. Nor did ZYZY present any evidence that Hernandez played a significant role in the day-to-day affairs of the tribe after the 2002 vote or had any influence over the tribal council's decisions on non-legal matters. In

her summary judgment affidavit, Hernandez testified, "I do not have a role in making governmental decisions for the KTTT,[4] such decisions are left to the KTTT Tribal Council. I am not a member of the KTTT. I am not a prosecutor for the KTTT Tribal Court. I have no responsibility for law enforcement. I do not have any authority to make decisions of any governmental nature for the KTTT." At oral argument, counsel for ZYZY acknowledged that the Eagle Pass papers' reporting alone could not make Hernandez a public figure. Instead, ZYZY relies on Hernandez's testimony at the April 2006 hearing regarding her activities in seeking meetings with public officials and *San Antonio Express-News* articles in which Hernandez allegedly is reported making comments beyond her activities as a lawyer.

ZYZY contends Hernandez's "extensive activities" in directly approaching public officials to pursue issues related to tribal leadership were such that she necessarily exposed herself to an increased risk of injury to reputation. ZYZY's evidence of these activities is solely Hernandez's own testimony at the April 2006 hearing. During her testimony, Hernandez was asked what options her clients had in 2002, other than the vote of conscience, to show they did not approve of the tribal administration. Hernandez responded:

> Well, before the recall petition, the tribe — and when I say the tribe, remember, the [current] council members were not the core group that was working towards this – it was another group of young people who don't even — didn't even qualify to be council members. They were trying to find every avenue available to them.
>
> Research had already told me that the Federal Government had already ruled that they were going to get no recourse there. The recall petition was being ignored. The next stop we made was go to state court.
>
> State court, we had one hearing, Joe Ruiz appeared and he vehemently claimed that state court or federal court had no jurisdiction.
>
> So, that left the Kickapoo Tribe without any relief in the court system outside of the tribe. Since there was no court within the tribe, the next stop after

---

[4] The Kickapoo Traditional Tribe of Texas.

we were thrown out of state court was to go talk to the BIA [Bureau of Indian Affairs]. Mr. Gary Water was there. There were other people. I can't recall their names.

All this time, the tribal members are calling and talking to whoever that will listen to them: State representatives, state senators, anybody, congressmen, senators, U.S. Senators. They were trying to say, Here, here, listen to us, here's what's happening, help us.

The next stop was BIA and BIA said, Sorry, you know, it's an internal matter, you go fix it yourself. Next stop was go to Washington, D.C. I think we all put — some people put some money together and did a little pitching here and there. And we ended up in Washington, D.C. We had met with several department heads. Department of Interior was there — was represented, I think. Department of Justice was represented.

And basically, they listened to the story and said, Sorry, it's an internal matter. Thank you very much. We feel for you. And that was it.

Hernandez testified the direct contacts with representatives, senators, and congressmen were made by tribal members, and ZYZY did not present any evidence to the contrary. Although she testified she went with her clients to meetings with the BIA, the Department of Interior, and the Department of Justice, the record does not reflect what role Hernandez played in those meetings. The record contains no media coverage of the meetings, and nothing in the record suggests Hernandez did anything other than accompany her clients. We hold that merely accompanying a client to meet with elected officials to discuss matters of importance in his district or to meet with representatives of agencies that have some oversight authority over the lawyer's client does not make a lawyer a public figure.

ZYZY also argues that the *San Antonio Express-News* articles reporting Hernandez's comments about the tribe's future activities and intentions show she has become part of the controversy and not merely a legal advocate. We disagree. ZYZY submitted fourteen articles about the Kickapoo from the *Express-News* in which Hernandez is named, covering the period August 2002 until early June 2007. More than half the articles are from 2002, and concern the

recall petition, vote of conscience, and related litigation.  All the articles refer to Hernandez as counsel for the one faction or for the tribe and report her response to a reporter's inquiry about the status of the various proceedings.

The record contains five *Express-News* articles published over the next four and one-half years.  These articles include quotes from Hernandez responding to (1) the Maverick County district attorney's and investigators' stated concerns that a Kickapoo girl was buried without an autopsy; (2) a legislative proposal to allow video slot machines at various venues around the state; (3) the State of Texas's federal court lawsuit opposing the tribe's application for a Class III gambling license and the Department of Interior's preliminary decision on the application; and (4) the county's efforts to close eight-liner parlors that illegally competed with the tribe's casino. Finally, ZYZY submitted one article from April 2004 from the *Dallas Morning News*.  That article reported on a proposal to allow slot machines at racetracks as a means to generate school revenue.  The article discusses what effect the plan might have on the Kickapoo, and quotes Hernandez, who is referred to as a lawyer for the tribe, saying, "This was brought to us within the last 24 hours, and the council has not had time to discuss it.  But obviously the tribe wants to remain viable."  Nothing in the *Express-News* or *Dallas Morning News* articles suggests Hernandez sought out the publicity; rather, the articles indicate she was merely responding to press inquiries regarding legal matters affecting the tribe.

In its brief, ZYZY also relies upon reported comments by Hernandez about future events — that Hernandez was preparing a motion to be filed in a federal court suit and that the tribe would try other means to obtain a broader gaming license if unsuccessful in the suit filed by the State of Texas — to argue Hernandez is a limited-purpose public figure.  However, we disagree that these comments make Hernandez a limited-purpose public figure for purposes of this suit.

First, the controversy that was the subject of the April 2006 hearing and article did not involve the tribe's effort to expand its gaming license. Second, Hernandez's comments, in context, do not show Hernandez abandoned her role as an attorney or that she was attempting to influence public opinion.

ZYZY's summary judgment evidence shows that Hernandez provided legal advice and representation to tribe members who sought a change in tribe leadership in 2002, that she was hired as the tribe's attorney after the leadership change, and that she continued in that capacity through the April 2006 hearing and publication of the article subject of this suit. The evidence does not show that she became involved in the controversy regarding the tribe leadership beyond her role as a legal advocate, that she thrust herself into the public eye by engaging the media, had any special access to the media, or that she used the media in an attempt to influence the outcome of the controversy. On this record, we cannot say that ZYZY established as a matter of law that Hernandez is a limited-purpose public figure. Accordingly, the trial court did not err in denying the motion seeking summary judgment because of the absence of malice against a public figure plaintiff.

## CONCLUSION

We hold Hernandez's lawsuit was timely filed within the limitations period and ZYZY failed to prove as a matter of law Hernandez was a limited-purpose public figure. We therefore affirm the trial court's order denying ZYZY's motion for summary judgment.

Steven C. Hilbig, Justice