**WFAA–TV, INC., Petitioner,**

v.

**John McLEMORE, Respondent.**

No. 97–0868.

Supreme Court of Texas.

Argued April 1, 1998.

Decided Sept. 24, 1998.

Paul C. Walter, Rachel Elizabeth Boehm, Dallas, R. Matt Dawson, Corsicana, for petitioner.

Aubrey R. Williams, Greg White, John Alonzo Montez, Felipe Reyna, Waco, for respondent.

HANKINSON, Justice, delivered the opinion for a unanimous Court.

In this defamation suit arising out of the 1993 Bureau of Alcohol, Tobacco and Firearms (ATF) raid on the Branch Davidian compound at Mount Carmel, we decide whether a media plaintiff, one of only a few journalists to report live from the scene of the raid, whose reports were rebroadcast worldwide, and who willingly gave numerous interviews about his role in the failed raid, is a public figure. The plaintiff sued WFAA–TV Channel 8 in Dallas alleging that its news reports concerning his role in the failed raid damaged his reputation in the community. The trial court denied WFAA's motion for summary judgment, and the court of appeals affirmed. 979 S.W.2d 337. Because we conclude that the plaintiff in this case became a limited-purpose public figure after thrusting himself to the forefront of the controversy surrounding the failed ATF assault, we reverse the court of appeals' judgment and render judgment that the plaintiff take nothing.

On February 28, 1993, ATF agents approached the Mount Carmel compound occupied by the Branch Davidians, a small religious sect that had amassed an arsenal of illegal weaponry. Two local media outlets, KWTX–TV Channel 10 in Waco and the *Waco Tribune–Herald,* learned from various sources that a major law enforcement operation would proceed at Mount Carmel that morning. KWTX–TV dispatched reporter John McLemore and cameraman Dan Mullony to report on the event.

When the ATF agents attempted to enter one of the buildings on the compound, they became involved in a gunfight with the Davidians. During the battle, four ATF agents and three Davidians were killed, and twenty ATF agents were wounded. McLemore and Mullony, the only media representatives to follow the agents onto the compound, reported live from the midst of the firefight.

Two days after the gunfight, media reports began to focus on why the ATF raid had failed and what sparked the gunfight. On March 2, 1998, Kathy Fair, a *Houston Chronicle* reporter, appeared on *Nightline*, an ABC news show anchored by Ted Koppel. During the show, Koppel and Fair discussed the media's role in the botched ATF raid. Koppel asked what went wrong with the media's coverage, and Fair initially responded that it was too early to determine. She then suggested ATF agents believed they were set up:

> I think many officers will tell you that they blame the media, particularly the local media, for the tragedy that occurred here. They think the fact that both the newspaper and the local television station, who were already at the compound, some of whom were reporters for, I believe, the TV station, allegedly were already hiding in the trees when federal agents arrived. And that was the first indication that many of them had that they had been set up, and that's a strong belief I think they have that they have not shared publicly yet, is that they think they were set up.

As soon as the *Nightline* broadcast ended, KWTX–TV began to receive calls critical of McLemore's role in the raid, even though Fair had not identified him by name.

WFAA picked up the story the next day and began to broadcast reports by Valerie Williams, a WFAA reporter, who repeated Fair's report that ATF agents saw local media hiding in trees at the compound before the attack began. WFAA then broadcast video footage of McLemore while apparently on the compound grounds. Williams then continued her report:

> The only reporters at the scene Sunday morning were Steve [sic] McLemore and a television photographer from KWTX–TV

in Waco and one or two reporters from the local newspaper. McLemore's news unit was used to transport some of the wounded agents. Currently his bosses are consulting with attorneys before issuing a statement.

Later that evening, WFAA broadcast a similar piece, again repeating excerpts from *Nightline*, followed by commentary from Williams:

> [T]he only reporters at the scene Sunday morning were John McLemore and a photographer.... Wednesday night McLemore's station ... demanded a retraction from *Nightline* saying, "[T]he rumor that a Waco reporter had tipped the cult about the raid in exchange for permission to be on the compound grounds was completely false. No reporter or photographer from local media was on the compound grounds prior to the raid."

Soon after the reports aired, McLemore sued WFAA–TV, Valerie Williams, A.H. Belo Corporation, Belo Productions, Inc., the *Houston Chronicle*, and Kathy Fair for defamation, alleging that their news reports of his role in the failed raid damaged his reputation in the community. WFAA moved for summary judgment on six grounds: (1) no defamatory meaning; (2) fair report privilege; (3) fair comment privilege; (4) truth; (5) no actual malice; and (6) neutral reporting privilege. After McLemore nonsuited Williams and the two Belo corporations, the trial court granted summary judgment in favor of the *Chronicle* and Fair, but denied WFAA's motion for summary judgment.

Affirming the trial court's judgment, the court of appeals concluded that McLemore was a private individual, and as such, he had to prove negligence, not actual malice, in his defamation case. Because WFAA did not move for summary judgment on the grounds that it acted without negligence, the court of appeals determined that the issue was not before it and remanded the defamation action to the trial court for further proceedings consistent with its opinion. 979 S.W.2d at 343.

WFAA now appeals under section 22.225(d) of the Texas Government Code,

which provides this Court with jurisdiction to hear a petition for review from an interlocutory order denying a media party's motion for summary judgment in a defamation case. TEX. GOV'T CODE § 22.225(d); TEX. CIV. PRAC. & REM.CODE § 51.014(6). Specifically, WFAA argues that summary judgment is proper because McLemore is a public figure, and as a matter of law, it did not broadcast its reports with actual malice.

■ To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *See Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989)(citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). To have prevailed on its motion for summary judgment, WFAA must have disproved at least one essential element of McLemore's defamation claim. *See Doe v. Boys Clubs of Greater Dallas,* 907 S.W.2d 472, 476–77 (Tex.1995).

■ Fault is a constitutional prerequisite for defamation liability. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Private plaintiffs must prove that the defendant was at least negligent. *See Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 819 (Tex. 1976) (holding that "a private individual may recover damages from a publisher or broadcaster of a defamatory falsehood as compensation for actual injury upon a showing that the publisher or broadcaster knew or should have known that the defamatory statement was false"); *see also Gertz,* 418 U.S. at 347, 94 S.Ct. 2997 (holding that states may define for themselves the appropriate standard of liability for a publisher of a defamatory falsehood injurious to a private individual "so long as they do not impose liability without fault"). Public officials and public figures must establish a higher degree of fault. They must prove that the defendant published a defamatory falsehood with actual malice, that is, with "knowledge that it was false or with reckless disregard of whether it was false or

not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710 (defining the actual malice standard and applying it to public officials); *see also Curtis Pub. Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (applying the *New York Times* actual malice standard to public figures).

■ Because a defamation plaintiff's status dictates the degree of fault he or she must prove to render the defendant liable, the principal issue in this case is whether McLemore is a public figure. The question of public-figure status is one of constitutional law for courts to decide. *See Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Trotter v. Jack Anderson Enters., Inc.,* 818 F.2d 431, 433 (5th Cir.1987). Public figures fall into two categories: (1) all-purpose, or general-purpose, public figures, and (2) limited-purpose public figures. General-purpose public figures are those individuals who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts. *See Gertz,* 418 U.S. at 351, 94 S.Ct. 2997. Limited-purpose public figures, on the other hand, are only public figures for a limited range of issues surrounding a particular public controversy. *See id.*

■ To determine whether an individual is a limited-purpose public figure, the Fifth Circuit has adopted a three-part test:

> (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;
>
> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and
>
> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Trotter,* 818 F.2d at 433 (citing *Tavoulareas v. Piro,* 817 F.2d 762, 772–73 (D.C.Cir.1987) (en banc)); *see also Waldbaum v. Fairchild Pub., Inc.* 627 F.2d 1287, 1296–98 (D.C.Cir. 1980). Although the *Trotter/Waldbaum* test does not distinguish between plaintiffs who have voluntarily injected themselves into a controversy and those who are involuntarily

drawn into a controversy, some courts have held that plaintiffs who are drawn into a controversy cannot be categorized as limited-purpose public figures.[1] Because, as we explain below, McLemore clearly voluntarily injected himself into the controversy at issue, we need not decide in this case whether "voluntariness" is a requirement under the limited-purpose public-figure test we apply. Nevertheless, the *Trotter/Waldbaum* elements provide a "generally accepted test" to determine limited-purpose public-figure status. *See, e.g., Little v. Breland,* 93 F.3d 755, 757 (11th Cir.1996); *Harris v. Quadracci,* 48 F.3d 247, 251 (7th Cir.1995); *Silvester v. American Broad. Co.,* 839 F.2d 1491, 1494 (11th Cir.1988); *Faigin v. Kelly,* 978 F.Supp. 420, 427 (D.N.H.1997); *Russo v. Conde Nast Pub.,* 806 F.Supp. 603, 609 (E.D.La.1992); *Brueggemeyer v. American Broad. Co.,* 684 F.Supp. 452, 455, 457–58 (N.D.Tex.1988).

■ Applying the *Trotter/Waldbaum* limited-purpose public-figure elements to this case, we must first determine the controversy at issue. *Trotter,* 818 F.2d at 433–34; *Waldbaum,* 627 F.2d at 1296. In *Waldbaum,* the D.C. Circuit elaborated on how to determine the existence and scope of a public controversy:

> To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.

627 F.2d at 1297. In this case, numerous commentators, analysts, journalists, and public officials were discussing the raid and the reasons why the ATF raid failed. As evidenced by Fair's comments during the *Nightline* broadcast, as well as reports by *The Dallas Morning News* and the *Fort Worth Star Telegram,* the press was actively covering the debate over why the ATF raid failed. Many such discussions focused on the role of the local media in the ATF's failure to capture the Davidian compound. The controversy surrounding the Branch Davidian raid was public, both in the sense that people were discussing it and people other than the immediate participants in the controversy were likely to feel the impact of its resolution. *See Trotter,* 818 F.2d at 433; *Waldbaum,* 627 F.2d at 1297; *see also Einhorn v. LaChance,* 823 S.W.2d 405, 413 (Tex.App.— Houston [1st Dist.] 1992, writ dism'd w.o.j.). While the court of appeals defined the controversy as limited to "McLemore's personal ethical standards as a journalist," we do not view it so narrowly. Based on the facts outlined above, we conclude that the public controversy at issue is the broader question of why the ATF agents failed to accomplish their mission.

■ To determine that an individual is a public figure for purposes of the public controversy at issue, the second *Trotter/Waldbaum* element requires the plaintiff to have had more than a trivial or tangential role in

---

1. *See, e.g., Lerman v. Flynt Distrib. Co., Inc.,* 745 F.2d 123, 136–37 (2nd Cir.1984) (adopting four-part limited public-figure test, requiring defendant to prove plaintiff: (1) "successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media"); *Fitzgerald v. Penthouse Intern'l, Ltd.,* 691 F.2d 666, 668 (4th Cir.1982) (adopting five-part limited public figure test, requiring defendant to prove: "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation"); *Clark v. American Broad. Co., Inc.,* 684 F.2d 1208, 1218 (6th Cir.1982) (considering three elements to determine if plaintiff is limited public figure: "first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy"); *But cf. Gertz,* 418 U.S. at 351, 94 S.Ct. 2997 ("More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.").

the controversy. *Trotter*, 818 F.2d at 433; *Waldbaum*, 627 F.2d at 1297. In considering a libel plaintiff's role in a public controversy, several inquiries are relevant and instructive: (1) whether the plaintiff actually sought publicity surrounding the controversy, *Brewer v. Memphis Pub. Co.*, 626 F.2d 1238, 1254 (5th Cir.1980); (2) whether the plaintiff had access to the media, *see, e.g., Gertz*, 418 U.S. at 344, 94 S.Ct. 2997; *Curtis*, 388 U.S. at 155, 87 S.Ct. 1975; and (3) whether the plaintiff "voluntarily engag[ed] in activities that necessarily involve[d] the risk of increased exposure and injury to reputation," *see Brewer*, 626 F.2d at 1254; *Waldbaum*, 627 F.2d at 1294–95; *see also Kassel v. Gannett Co., Inc.*, 875 F.2d 935, 939–40 (1st Cir.1989); *Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 724 P.2d 562, 571 (Ariz.1986). "By publishing your views you invite public criticism and rebuttal; you enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition in the marketplace." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir.1996).

The record reflects that McLemore acted voluntarily to invite public attention and scrutiny on several occasions and in several different ways during the course of the public debate on the failed ATF raid. For example, McLemore was the only journalist to go onto the grounds of the compound, while other reporters assigned to cover the raid did not. By reporting live from the heart of the controversial raid, McLemore assumed a risk that his involvement in the event would be subject to public debate. Following the battle, McLemore spoke to other members of the press about the attempted raid, conveying his pride in his coverage from the midst of the gunfight, and portraying himself as a hero in assisting wounded ATF agents when he remarked that his role in the raid was "at considerable personal risk" and in contrast to other journalists who "were pinned down in a ditch" outside the compound. As a journalist, McLemore had ready, continual access to the various media sources. To one group of reporters, he explained that "as a journalist, I was ... pleased to see that my coverage of this story was being broadcast to a wide audience." Thus, by choosing to engage in activities that necessarily involved increased public exposure and media scrutiny, McLe-

more played more than a trivial or tangential role in the controversy and, therefore, bore the risk of injury to his reputation. *See Brewer*, 626 F.2d at 1254.

The third and final element we consider—that the alleged defamation is germane to the plaintiff's participation in the controversy—is also satisfied in this case. *See Trotter*, 818 F.2d at 433; *Waldbaum*, 627 F.2d at 1298. McLemore alleges that WFAA defamed him by displaying footage of his coverage from the scene of the compound during the raid, while reporting that federal officials believed a member of the local media informed the Branch Davidians about the ATF raid. Therefore, the alleged defamation directly relates to McLemore's participation in the controversy. He was on the scene in his role as a journalist, as conveyed by the footage WFAA broadcast, and WFAA's alleged defamatory comments are indeed germane to McLemore's participation in the controversy over the media's role in the failed attack. *See Waldbaum*, 627 F.2d at 1298–1300 (explaining that a public figure's talents, education, experience, and motives were relevant to the public's decision to listen to him). Accordingly, McLemore reached limited-purpose public-figure status through his employment-related activities when he voluntarily injected himself into the Branch Davidian raid.

We now turn to the fault standard McLemore must meet in order to sustain his defamation claim against WFAA. As a public figure, McLemore must prove that WFAA acted with actual malice in allegedly defaming him. *See Curtis*, 388 U.S. at 162, 87 S.Ct. 1975 (Warren, C.J., concurring); *New York Times*, 376 U.S. at 283, 84 S.Ct. 710; *see also Bose Corp. v. Consumers Union of the U.S., Inc.*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Actual malice is a term of art, focusing on the defamation defendant's attitude toward the truth of what it reported. *See McCoy v. Hearst Corp.*, 42 Cal.3d 835, 231 Cal.Rptr. 518, 727 P.2d 711, 736 (Cal.1986). Actual malice is defined as the publication of a statement "with knowledge that it was false

or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710. Reckless disregard is also a term of art. To establish constitutional recklessness, a defamation plaintiff must prove that the publisher "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

■ A libel defendant is entitled to summary judgment under Texas law if it can negate actual malice as a matter of law. *See Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646–47 (Tex.1995); *Casso v. Brand,* 776 S.W.2d 551, 555 (Tex.1989). A libel defendant can negate actual malice by presenting evidence that shows he or she did not publish the alleged defamatory statement with actual knowledge of any falsity or with reckless disregard for the truth. *See Casso,* 776 S.W.2d at 559. To negate actual malice in this case, in her affidavit, WFAA reporter Valerie Williams detailed her belief that all of the reports she made were true and set forth the basis of those reports. Specifically, she swore that "[she] believed [her] reports accurately reflected public allegations by responsible, respected and well-informed journalists and news organizations, regarding a highly newsworthy matter and concerned an official investigation by law enforcement officers of a suspected tip-off of the Branch Davidian cult." She explained in detail the foundation of her belief by providing a chronology of the actions she took and the materials she reviewed in preparing her report. This testimony as to Williams' beliefs and the basis for them was sufficient for WFAA to meet its burden of negating actual malice. *See Randall's Food Mkts., Inc.,* 891 S.W.2d at 646–47; *Casso,* 776 S.W.2d at 559; *Carr v. Brasher,* 776 S.W.2d 567, 571 (Tex.1989). As McLemore presented no proof controverting these specific assertions, WFAA established as a matter of law that it did not act with actual malice in reporting the ATF's investigation into why the Branch Davidian raid failed, and therefore WFAA was entitled to summary judgment on McLemore's defamation claim.

Accordingly, we reverse the court of appeals' judgment and render judgment that McLemore take nothing.