# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00392-CV

---

**Elon Musk, Appellant**

**v.**

**Benjamin Brody, Appellee**

---

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-23-006883
### THE HONORABLE MARIA CANTÚ HEXSEL, JUDGE PRESIDING

---

## O P I N I O N

Benjamin Brody sued Elon Musk for defamation based on a comment Musk posted on Twitter (later renamed X). Musk filed a motion to dismiss the action under the Texas Citizens Participation Act (TCPA), Tex. Civ. Prac. & Rem. Code § 27.003(a), arguing that his comment was a protected exercise of the right of free speech made in connection with a matter of public concern. After authorizing discovery and conducting a hearing, the trial court denied the motion to dismiss. Musk perfected this interlocutory appeal. We will reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 24, 2023, two far-right groups—the Proud Boys and the Rose City Nationalists[1]—tried to disrupt a Pride Night event in Portland, Oregon. The two groups, however,

---

[1] The Rose City Nationalists, sometimes referred to as "Patriot Front," is reported to be a neo-Nazi group.

ended up clashing with each other, culminating in a violent confrontation caught on video. Although the Rose City Nationalists had arrived wearing masks, the Proud Boys removed some of their masks, exposing to the camera the faces of two Rose City Nationalists members.

The following day, the video of the brawl circulated widely on social media, becoming a popular topic of discussion. As part of that discussion, some right-wing influencers claimed that the Rose City Nationalists at the event were actually undercover federal agents or left-wing provocateurs posing as neo-Nazis. Several of these influencers tried to identify the two unmasked brawlers. For example, TwitterUser#1[2] tweeted, "Two unmasked members of Patriot Front. These are either federal agents masquerading as racists - OR- Leftists masquerading as far right. Do you know who these people are?"

Within hours, Twitter users tried to answer that question. Some wrongly identified Brody, then a student at the University of California, Riverside, as one of the unmasked brawlers. The basis for that false identification was apparently a resemblance between Brody and one of the unmasked men. TwitterUser#2 responded with a photo of Brody and a screenshot of a social-media post from Brody's college fraternity, which included a sentence from the post stating that "[a]fter graduation [Brody] plans to work for the government." TwitterUser#2 later posted additional images that included Brody's name and stated that a "member of patriot front is ACTUALLY a political science student at a liberal school on a career path toward the feds." Other Twitter users reposted the TwitterUser#2 posts about Brody.

When the video of the Portland brawl went viral on Twitter on June 25, Musk saw it and tweeted, "Who were the unmasked individuals?" TwitterUser#3 replied to Musk's question

---

[2] For purposes of privacy, we will refer to Twitter users by pseudonyms. Any similarity between these pseudonyms and the names of actual Twitter or X users is purely accidental.

by attaching the second post from TwitterUser#2, including Brody's photograph and the screenshot from his fraternity's social-media post. Musk responded, "Very odd." TwitterUser#3 posted the same images that TwitterUser#2 had posted. Later that same day TwitterUser#4 posted the same images that TwitterUser#2 had posted and claimed that Brody was a federal agent posing as a "fake Nazi" at the rally. Musk responded, "Always remove their masks." Brody does not claim that either of Musk's posts on June 25 was defamatory.

Brody himself learned of his false identification on the evening of June 25. He received messages from his friends telling him that Elon Musk had posted a reply on Twitter asking about the rumor, and that people had shown him Brody's name, photo, and the post from his fraternity's social-media page.

Early the next morning, June 26, when he felt the situation was getting out of hand, Brody posted a one-minute video on his Instagram account stating that he was not part of the Patriot Front and had not been at the Pride Night event in Portland. He also posted debit-card receipts and time-stamped video footage showing that he was in California, not Oregon, when the brawl occurred.

Nonetheless, the next day, June 27, the debate continued to swirl on Twitter. TwitterUser#5 tweeted a zoomed-in still photo from the video of the brawl that depicted one of the unmasked men. Musk replied to this post with the comment, "Looks like one is a college student (who wants to join the govt) and another is maybe an Antifa member, but nonetheless a probable false flag situation." Based on that single tweet, Brody filed this defamation action in Travis County District Court. The suit alleges one count of libel against Musk.

In response to the lawsuit, Musk filed a motion to dismiss Brody's action under Subsection 27.003(a) of the TCPA. The motion asserted first that the TCPA applied because his

3

comment was a protected exercise of the right of free speech made in connection with a matter of public concern. Brody does not deny the general applicability of the TCPA. The trial court allowed discovery, including Musk's deposition. Following the completion of discovery and a hearing, the trial court denied Musk's motion to dismiss. Musk perfected this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code § 51.014(12).

## DISCUSSION

### *Was Musk's motion to dismiss timely?*

The TCPA provides that "[i]f a legal action is based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association or arises from any act of that party in furtherance of the party's communication or conduct described by Section 27.010(b), that party may file a motion to dismiss the legal action." Tex. Civ. Prac. & Rem. Code § 27.003(a). The TCPA requires that "[a] motion to dismiss a legal action under this section must be filed not later than the 60th day after the date of service of the legal action." *Id.* § 27.003(b). Although Musk's motion to dismiss was filed within the deadline, it was signed by Alex Spiro, a New York attorney who, at the time the motion was filed, was not licensed to practice in Texas. In opposing the motion, Brody argued that Musk had not timely filed the motion because it was signed by an attorney whose application for *pro hac vice* admission in Texas state court had not yet been granted. Because the timeliness of Musk's motion is a threshold issue, we address it first.

The phrase "*pro hac vice* forthcoming" appeared next to Spiro's name on the signature line of Musk's motion. Also listed on the motion as an attorney for Musk, but below the signature line, was Emiliano D. Delgado, an attorney licensed in Texas. Spiro later filed a *pro hac vice* motion. In the meantime, Brody filed in the trial court a motion to strike Musk's motion to

4

dismiss on the basis that Musk's motion, not having been signed by an attorney licensed to practice in Texas, was a nullity. The trial court subsequently granted Spiro's *pro hac vice* motion and denied Brody's motion to dismiss Musk's TCPA motion.

Brody advances this same argument in this Court as a basis for affirming the trial court's Order. Relying on *In re AutoZoners, LLC*, 694 S.W.3d 219 (Tex. 2024), Brody argues that because Musk's motion was signed by a lawyer who was not, at that time, authorized to practice law in Texas, it was a nullity. Therefore, Brody argues, the motion was untimely. We disagree.

The supreme court's opinion in *AutoZoners* is distinguishable. The issue there was whether the trial court abused its discretion by *denying* an out-of-state attorney's *pro hac vice* motion after the pleading bearing the attorney's signature had been filed. The supreme court held that the trial court had abused its discretion by denying the motion. *Id.* at 225–26. The court did not address whether a pleading signed by an out-of-state attorney would be valid when the attorney's *pro hac vice* motion was later granted.

In the present case, Musk's motion was granted, so the holding in *AutoZoners* is not on point.[3] The court in *AutoZoners* implied—but did not hold—that there might be *ethical* concerns when an out-of-state attorney's name and contact information appear on the signature

---

[3] It is also noteworthy that the supreme court in *AutoZoners* stated that "[s]ignature blocks used throughout courts in Texas frequently include the names of out-of-state attorneys whose motions for admission pro hac vice are pending or forthcoming." *In re AutoZoners, LLC*, 694 S.W.3d 219, 223 (Tex. 2024). The court went on to note that the names of out-of-state attorneys are "often" listed below the name of the Texas attorney. *Id.* The use of the word "often" evinces the court's recognition that the name of an out-of-state attorney is sometimes *not* listed below the name of the Texas attorney, but the court did not condemn or question that practice.

5

line of a pleading before the attorney is admitted *pro hac vice*, but the court did not hold or imply that such a pleading would be invalid if the *pro hac vice* motion were later granted.[4]

We find persuasive the Dallas Court of Appeals' decision in *TNT Bestway Transp., Inc. v. Whitworth*, No. 05-96-01900-CV, 1999 WL 374158 (Tex. App.—Dallas June 10, 1999, pet. denied) (op., not designated for publication). The issue in *Bestway* was identical to that in the present case. There, an out-of-state attorney had signed responses to requests for admission before she had been admitted *pro hac vice* to appear in the pending case. *Id.* at *2. Although her *pro hac vice* motion was later granted, the opposing party argued that her premature signature rendered the pleading void or untimely. *Id.* at *6.

Although the Dallas Court of Appeals found no Texas case on point, it cited several cases from other jurisdictions that had decided, on similar facts, that an out-of-state attorney's subsequent admission *pro hac vice* cured any defect that occurred before the attorney was admitted. *See id.* at *6–7; *cf. Walsh v. Rokoko Elecs.*, No. 2:25-CV-05340-ODW (RAOX), 2025 WL 3707044, at *2 (C.D. Cal. Dec. 22, 2025) ("This procedure [filing a motion stating that a *pro hac vice* application is forthcoming] is routine practice and takes place in courts throughout the country."). The court held that the out-of-state attorney's signature on the responses before her subsequent admission *pro hac vice* to practice in Texas state court did not render the responses void or untimely. *See Bestway*, 1999 WL 374158, at *6–7. We find this holding persuasive and in keeping with the Texas Supreme Court's repeated admonition that disposing of appeals based on harmless procedural defects is disfavored. *See, e.g., In re A.C.T.M.*, 682 S.W.3d 234, 238 (Tex. 2023) ("Rather than disposing of appeals based on harmless procedural defects, 'appellate courts

---

[4] In the present case, any potential ethical issues are not before us, and we make no comment on any such issues.

6

should reach the merits of an appeal whenever reasonably possible.'" (quoting *Horton v. Stovall*, 591 S.W.3d 567, 567 (Tex. 2019))); *see also Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008). We agree with the *Bestway* decision and hold that Spiro's signature on Musk's motion to dismiss did not render the motion a nullity or untimely.

*TCPA law*

The statutorily expressed purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002. On motion of the defendant, the court must dismiss an action if it is based on the party's exercise of one of the rights listed above unless "the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Whether the parties have met their respective burdens under Section 27.005 is a question of law that we review de novo. *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019).

Thus, the first step in the process is to determine whether the plaintiff's legal action was in response to the defendant's exercise of the right of free speech, the right to petition, or the right of association, i.e., to determine if the TCPA applies at all. *McLane Champions, LLC v. Houston Baseball Partners LLC*, 671 S.W.3d 907, 914 (Tex. 2023). The TCPA defines "exercise of the right of free speech" to mean "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code § 27.001(3); *see also Walgreens v. McKenzie*, 713 S.W.3d 394, 398 (Tex. 2025). Comments posted on social media sites are "communications"

7

within the meaning of the TCPA. *Whitelock v. Stewart*, 661 S.W.3d 583, 596 (Tex. App.—El Paso 2023, pet. denied) (citing *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam)).

Brody does not contest that Musk's comment involved a matter of free speech as defined by the statute. Accordingly, the burden shifted to Brody to establish "by clear and specific evidence" a prima facie case for each essential element of his defamation claim. *See Polk Cnty. Publ'g Co. v. Coleman*, 685 S.W.3d 71, 76 (Tex. 2024); *In re Lipsky*, 460 S.W.3d 579, 587 (Tex. 2015). "Prima facie means 'at first sight,' and under the Act, is the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.' Evidence is 'clear and specific' if it provides enough detail to show the factual basis for the claim." *USA Lending Grp., Inc. v. Winstead PC*, 669 S.W.3d 195, 200 (Tex. 2023) (citations omitted).[5]

**Was Brody a limited-purpose public figure?**

"To prevail on a claim of defamation, a plaintiff must prove '(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases.'" *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023) (quoting *In re Lipsky*, 460 S.W.3d at 593).

"The status of the person allegedly defamed determines the requisite degree of fault. A private individual need only prove negligence, whereas a public figure or official must prove actual malice." *In re Lipsky*, 460 S.W.3d at 593; *see also Roe v. Patterson*, 707 S.W.3d 94, 99 (Tex. 2025) ("A defamation plaintiff who is not a public figure must prove that the defendant knew

---

[5] A third step in the TCPA process, not relevant here, is that if the nonmovant establishes a prima facie case, the court must still "dismiss a legal action against the moving party if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." Tex. Civ. Prac. & Rem. Code § 27.005(d); *see also O'Rourke v. Warren*, 673 S.W.3d 671, 680 (Tex. App.—Austin 2023, pet. denied).

or should have known that the statement was false and defamatory. A plaintiff who is a public figure must further demonstrate that the statement was made with actual malice."). The question of public-figure status is one of constitutional law for courts to decide. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

Musk argues that Brody is a "public figure" for purposes of this case. Because a plaintiff's status dictates the degree of fault he must prove to render the defendant liable in a defamation action, one potential issue in this case is whether Brody must be classified as a public figure.

The United States Supreme Court has held that the designation of "public figure" in the context of defamation law

> may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). The Texas Supreme Court has echoed this holding in slightly different language:

> Public figures fall into two categories: (1) all-purpose, or general-purpose, public figures, and (2) limited-purpose public figures. General-purpose public figures are those individuals who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts. *See Gertz* [*v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)]. Limited-purpose public figures, on the other hand, are only public figures for a limited range of issues surrounding a particular public controversy.

*WFAA-TV*, 978 S.W.2d at 571.

9

Musk does not assert that Brody is an "all-purpose" public figure. Therefore, the issue here is whether he is a "limited-purpose" public figure. The supreme court in *WFAA-TV* adopted a three-part test for determining whether an individual is a limited-purpose public figure in a defamation case:

> (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;
>
> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and
>
> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Id.* (citing *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir.1987) and *Waldbaum v. Fairchild Publ'ns., Inc.*, 627 F.2d 1287, 1296–98 (D.C. Cir.1980)). This test is still used. *See, e.g.*, *Pecan St. Owners Ass'n v. Mala Vida, LLC*, No. 03-25-00216-CV, 2025 WL 2981633, at *5 (Tex. App.—Austin Oct. 23, 2025, no pet.) (mem. op.).

As stated above, the United States Supreme Court held in *Gertz* that even an individual who does not have "pervasive fame or notoriety" may be given "public figure" status if he "voluntarily injects himself or is drawn into a particular public controversy." 418 U.S. at 351.

Musk argues first that Brody was an "involuntary" limited-purpose public figure, meaning that he should be assigned such status as a result of being "drawn into" a public controversy without regard to whether his own actions "inject[ed] himself" into the controversy. The Texas Supreme Court, however, has echoed the United States Supreme Court in holding that it would be extremely rare for an individual to become a limited-purpose public figure solely by being "dragged unwillingly into a controversy":

> Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.

*Neely v. Wilson*, 418 S.W.3d 52, 71 (Tex. 2013) (quoting *Gertz*, 418 U.S. at 345); *see also Neyland v. Thompson*, No. 03-13-00643-CV, 2015 WL 1612155, at *6–7 (Tex. App.—Austin Apr. 7, 2015, no pet.) (mem. op.). Indeed, the supreme court in *Neely* noted that "neither the United States Supreme Court nor this Court has found circumstances in which a person involuntarily became a limited-purpose public figure." 418 S.W.3d at 71; *see also Jones v. Pozner*, No. 03-18-00603-CV, 2019 WL 5700903, at *8 (Tex. App.—Austin Nov. 5, 2019, pet. denied) (mem. op.).

On the present facts, we hold that Brody was not an "involuntary" limited-purpose public figure.

Musk next argues that Brody's own actions made him a limited-purpose public figure, i.e., that he "voluntarily injected himself" into the controversy surrounding the Portland street brawl. *Gertz*, 418 U.S. at 351. In determining the second element of the limited-purpose-public-figure test—whether the plaintiff had more than a trivial or tangential role in the controversy—the court in *WFAA-TV* set forth several relevant inquiries:

> In considering a libel plaintiff's role in a public controversy, several inquiries are relevant and instructive: (1) whether the plaintiff actually sought publicity surrounding the controversy; (2) whether the plaintiff had access to the media; and (3) whether the plaintiff "voluntarily engag[ed] in activities that necessarily involve[d] the risk of increased exposure and injury to reputation.

11

*WFAA-TV*, 978 S.W.2d at 573 (citations omitted). The court emphasized that "[b]y publishing your views you invite public criticism and rebuttal; you enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition in the marketplace." *Id.* (quoting *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996)).

First, it seems to us that the true "public controversy" regarding the Portland street brawl was not Brody's identity but whether there was an attempt by federal agents or left-wing provocateurs to engage in a false-flag operation. The specific identities of the unmasked brawlers was relevant—and their identity debated—only as it related to that larger question. For the reasons that follow, however, we need not assign an exact description to that controversy. Whatever the precise contours of the public controversy, the second element of the limited-purpose public figure test is dispositive: Did Brody "thrust [himself] to the forefront of [the] particular public controvers[y] in order to influence the resolution of the issues involved"? *Neely*, 418 S.W.3d at 71 (quoting *Gertz*, 418 U.S. at 345); *see also Pecan St. Owners*, 2025 WL 2981633, at *5. It is necessary, therefore, to revisit Brody's actions concerning the incident.

On June 25, the day after the brawl, an anonymous person began spreading speculation that Brody was one of the unmasked brawlers. Variations of the rumor quickly began circulating on social media. Musk became aware of the discussions on June 26, but his Twitter comments that day are not alleged to be defamatory. The social media conversations about Brody continued to grow. By the morning of June 26, Brody decided he needed to do something to clear his name. As he testified by affidavit in response to Musk's motion to dismiss, "In the early hours of June 26th, I posted a video to my Instagram account explaining my innocence." The following is a complete transcription of his one-minute-four-second video:

12

Hey, what's up guys? My name is Ben Brody and I wanted to address the false accusations against me. I wanted to first say that I am not a part of the Patriotic Front as a member in that. People who are claiming I am. I am being confused with someone who looks similar to me, and I have never been to Oregon City for any protest whatsoever. Recently I have just been so busy in terms of graduation from U.C. Riverside and stuff like that. I was, you know, I've been in Riverside only, um this is just crazy to me, and I graduated on June 21st. I've just been hanging out with my friends and then all these accusations are kind of just crazy and incorrect and you know, I would, my family and I are just being harassed completely and I would be more than happy to clear up any confusion if necessary, you know, this is just so ridiculous and I really just can't believe this is happening to me right now guys. Um, but yeah.

As Brody explained in his affidavit, "Later that day, I also posted screenshots of debit card transactions I made in Riverside at the time I was allegedly in Portland. I also managed to get surveillance footage from one of the restaurants I went to, and I posted that as well." Around the second week of July, he agreed to grant an interview requested by a VICE news reporter who was interested in his story.

The foregoing evidence demonstrates that rather than *seeking* publicity about the incident, Brody sought to *eliminate* his publicity. Nor did he seek to influence a decision about whether the unmasked brawler was part of a false-flag operation. He merely said, effectively, "It wasn't me; leave me alone." We hold that the evidence demonstrates that Brody did not "thrust [himself] to the forefront of [the] particular public controvers[y] in order to influence the resolution of the issues involved." This conclusion is all the more obvious if the "public controversy" is considered to be the alleged existence of a false-flag operation. Brody had no knowledge to share about that question.

Even if the "public controversy" could be described as being Brody's own identity, however, we agree with the many courts that have held that a mere denial of a false or slanderous

13

claim does not convert a private citizen into a limited-purpose public figure. For example, the D.C. Circuit has held:

> [W]e have doubts about placing much weight on purely defensive, truthful statements made when an individual finds himself at the center of a public controversy but before any libel occurs; it is not clear why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from defamation. Indeed, the cases have suggested that ordinarily something more than a plaintiff's short simple statement of his view of the story is required; he renders himself a public figure only if he voluntarily "draw[s] attention to himself" or uses his position in the controversy "as a fulcrum to create public discussion."

*Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 32 (D.C. Cir. 1990); *see also Jankovic v. International Crisis Grp.*, 822 F.3d 576, 588 (D.C. Cir. 2016) ("[T]he court does not give great weight to a plaintiff's press statements when the statements 'merely answer the alleged libel itself' or consist of 'purely defensive, truthful statements made when an individual finds himself at the center of a public controversy but before any libel occurs.'" (quoting *Clyburn*, 903 F.2d at 32)); *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 18–19 & n.12 (1st Cir. 2011) ("[A]n individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations."); *Pendleton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998) ("[O]ne does not become a public figure merely by defending oneself publicly against accusations."); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1564 (4th Cir. 1994) ("We see no good reason 'why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from defamation.'" (quoting *Clyburn*, 903 F.2d at 32)); *Alharbi v. Theblaze, Inc.*, 199 F. Supp. 3d 334, 357 (D. Mass. 2016) ("[O]ne does not become a public figure merely by defending oneself publicly against accusations." (quoting *Pendleton*, 156 F.3d at 68)); *Chafoulias v. Peterson*, 668 N.W.2d 642, 659–60 (Minn. 2003) ("We

14

see no good reason why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from defamation." (quoting *Foretich*, 37 F.3d at 1564)).

Brody's public comments about this controversy were not intended to "thrust [himself] to the forefront of [the] particular public controvers[y] in order to influence the resolution of the issues involved"; rather, they were nothing more than a simple denial of the accusation that he was one of the unmasked brawlers. We hold that Brody was not a limited-purpose public figure as to the present defamation action.

***Was Musk's comment actionable defamation?***

As stated above, the elements of a defamation claim include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). Musk challenges the sufficiency of Brody's evidence as to all four of these elements. We conclude that evidence of the first element is lacking and is conclusive as to the disposition of this case. Accordingly, we will not discuss the other three elements.

As to the first element above, distinguishing between a statement of fact and an expression of opinion can sometimes be difficult. *See, e.g.*, *NetScout Sys., Inc. v. Gartner, Inc.*, 223 A.3d 37, 47 (Conn. 2020) ("It should surprise no one that the distinction between actionable statements of fact and nonactionable statements of opinion is not always easily articulated or discerned."); *see also Zoanni v. Hogan*, 715 S.W.3d 47, 79 (Tex. App.—Houston [1st Dist.] 2024, pet. denied). We need not descend into that perplexity, however, because Brody concedes in his briefing to this Court that Musk's Twitter comment constituted an opinion rather than a strict

15

statement of fact. Nonetheless, there is no categorical protection of all opinions from defamation liability. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990). The question of which statements of opinion are protected from defamation liability—and which are not—has been the subject of many judicial opinions and legal commentaries both before and after the *Milkovich* decision.

In the present case, both parties rely on Section 566 of the Restatement (Second) of Torts, which states that "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement (Second) of Torts § 566 (Am. Law Inst. 1977); *see also Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 383 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("An alleged defamatory statement of opinion requires an implication of undisclosed facts to be actionable."). The majority opinion in *Milkovich* cited and quoted Section 566 and its comments approvingly, *see* 497 U.S. at 13, 14, 19, as did the dissenting opinion, *see id.* at 27 n.3 (Brennan, J., dissenting). All federal circuits[6] and virtually

---

[6] *See Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015); *Adelson v. Harris*, 774 F.3d 803, 807 (2d Cir. 2014); *Hill v. Cosby*, 665 F. App'x 169, 174–75 (3d Cir. 2016); *Swengler v. ITT Corp. Electro-Optical Prods. Div.*, 993 F.2d 1063, 1071 (4th Cir. 1993); *Favre v. Sharpe*, 117 F.4th 342, 347 (5th Cir. 2024); *Sandmann v. New York Times Co.*, 78 F.4th 319, 329 (6th Cir. 2023); *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1268 (7th Cir. 1996); *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1305 & n.8 (8th Cir. 1986); *Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995); *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1136 (10th Cir. 2017); *Utterback v. Morris*, No. 24-12947, 2025 WL 1455900, at *3 (11th Cir. May 21, 2025); *Turner v. Wells*, 879 F.3d 1254, 1263 (11th Cir. 2018); *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 625 (D.C. Cir. 2023).

every state[7] have recognized Section 566 as instructive and authoritative on the question of potential defamation liability for expressions of opinion. There are also numerous federal district court opinions.

The logic behind Section 566 is explained in Comment *b* to that section:

> *b. Types of expressions of opinion.* There are two kinds of expression of opinion. The simple expression of opinion, or the pure type, occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character. The statement of facts and the expression of opinion based on them are separate matters

[7] *See Sanders v. Smitherman*, 776 So. 2d 68, 74 (Ala. 2000); *Alaskasland.Com, LLC v. Cross*, 357 P.3d 805, 820 (Alaska 2015); *Turner v. Devlin*, 848 P.2d 286, 291 (Ariz. 1993); *Baker v. Los Angeles Herald Exam'r*, 721 P.2d 87, 94 (Cal. 1986); *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1358 (Colo. 1983); *NetScout Sys., Inc. v. Gartner, Inc.*, 223 A.3d 37, 48 (Conn. 2020); *Cousins v. Goodier*, 283 A.3d 1140, 1148 & n.41 (Del. 2022); *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 47 (D.C. 1983); *Barnes v. Horan*, 841 So. 2d 472, 476–77 (Fla. Dist. Ct. App. 2002); *Jaillett v. Georgia Television Co.*, 520 S.E.2d 721, 726 (Ga. Ct. App. 1999); *Williams v. Kanemaru*, No. CAAP-11-0000419, 2013 WL 4458887, *2 (Hi. Ct. App. Aug. 20, 2013); *Idaho State Bar v. Topp*, 925 P.2d 1113, 1115 (Idaho 1996); *Mittelman v. Witous*, 552 N.E.2d 973, 983 (Ill. 1989); *McQueen v. Fayette Cnty. Sch. Corp.*, 711 N.E.2d 62, 66 (Ind. Ct. App. 1999); *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 690 (Ky. 1990); *Sassone v. Elder*, 626 So. 2d 345, 353 (La. 1993); *Caron v. Bangor Pub. Co.*, 470 A.2d 782, 784 (Me. 1984); *Samuels v. Tschechtelin*, 763 A.2d 209, 242 (Md. Ct. Spec. App. 2000); *Peroutka v. Streng*, 695 A.2d 1287, 1297–99 (Md. Ct. App. 1997); *Lyons v. Globe Newspaper Co.*, 612 N.E.2d 1158, 1161 (Mass. 1993); *Deitz v. Wometco W. Michigan TV*, 407 N.W.2d 649, 654 (Mich. Ct. App. 1987); *In re Disciplinary Action Against MacDonald*, 962 N.W.2d 451, 462 (Minn. 2021); *Ferguson v. Watkins*, 448 So. 2d 271, 275–76 (Miss. 1984); *Henry v. Halliburton*, 690 S.W.2d 775, 787 (Mo. 1985); *Hale v. City of Billings, Police Dep't*, 986 P.2d 413, 419 (Mont. 1999); *Schoneweis v. Dando*, 435 N.W.2d 666, 671 (Neb. 1989); *Lubin v. Kunin*, 17 P.3d 422, 426 (Nev. 2001); *Boyle v. Dwyer*, 216 A.3d 89, 98 (N.H. 2019); *Lynch v. New Jersey Educ. Ass'n*, 735 A.2d 1129, 1137 (N.J. 1999); *Saenz v. Morris*, 746 P.2d 159, 162 (N.M. Ct. App. 1987); *Gross v. New York Times Co.*, 623 N.E.2d 1163, 1168 (N.Y. 1993); *Plough v. Schneider*, No. 10496, 1982 WL 4977, at *2 (Ohio Ct. App. Apr. 28, 1982); *McCullough v. Cities Serv. Co.*, 676 P.2d 833, 835 (Ok. 1984); *Hickey v. Settlemier*, 917 P.2d 44, 48 (Or. Ct. App. 1996); *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987); *Burke v. Gregg*, 55 A.3d 212, 220–21 (R.I. 2012); *Hill v. State*, No. M2022-01749.COA-R3-CV, 2025 WL 1078167, at *7 (Tenn. Ct. App. Apr. 10, 2025); *West v. Thomson Newspapers*, 872 P.2d 999, 1018–19 (Utah 1994); *Petrak v. Sawyers*, No. 0110-24-4, 2025 WL 2956919, at *4 (Va. Ct. App. Oct. 21, 2025); *Duc Tan v. Le*, 300 P.3d 356, 363 (Wash. 2013); *Long v. Egnor*, 346 S.E.2d 778, 788 (W. Va. 1986); *Terry v. Journal Broad. Corp.*, 840 N.W.2d 255, 263 (Wis. 2013); *Spence v. Flynt*, 816 P.2d 771, 775 (Wyo. 1991).

in this case, and at common law either or both could be defamatory and the basis for an action for libel or slander. The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated.

. . . .

The second kind of expression of opinion, or the mixed type, is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Here the expression of the opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant.

Restatement (Second) of Torts § 566, cmt. b.

The rationale behind this dichotomy of "pure" versus "mixed" expressions of opinion is that "when facts are merely implied, a listener is unable to assess the basis for that opinion. Where the underlying facts are fully revealed, however, 'readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.'" *Berry v. Schmitt*, 688 F.3d 290, 303–04 (6th Cir. 2012) (quoting *Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995)). As stated by the Third Circuit,

Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion. In such circumstances, if the underlying facts are false, the Constitution does not protect the opinion. *See* Restatement (Second) of Torts § 566A.

*Hill v. Cosby*, 665 F. App'x 169, 175 (3d Cir. 2016) (quoting *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985)).  The D.C. Circuit has stated the same logic, although not expressly citing to Section 566:

> [W]hen a writer gives a statement of opinion that is based upon true facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable so long as the opinion does not otherwise imply unstated defamatory facts.  Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.

*Moldea v. New York Times Co.*, 15 F.3d 1137, 1144–45 (D.C. Cir.), *modified*, 22 F.3d 310 (D.C. Cir. 1994).

As Brody quotes from Section 566 of the Restatement, "If the defendant expresses a derogatory opinion without disclosing the facts on which it is based, he is subject to liability if the comment creates the reasonable inference that the opinion is justified by the existence of unexpressed defamatory facts."  Brody argues that the facts supporting Musk's comment implying that Brody was one of the brawlers were not stated in his Twitter comment and therefore constituted "unexpressed defamatory facts."  Conceding that the relevant underlying facts were not expressly stated in his comment, Musk argues that those facts were known to readers because his comment was based on earlier tweets made by others and that therefore the underlying "facts" shown in those tweets (i.e., that Brody was a college student, that he apparently resembled one of the brawlers, and that he had stated a desire to work for the government) would have been known to any reader of his own comment.

19

Under Section 566, it is not essential for the underlying facts to be expressly stated in an offending "pure" opinion statement as long as readers of the communication would know of or assume the relevant underlying facts:

> The pure type of expression of opinion may also occur when the maker of the comment does not himself express the alleged facts on which he bases the expression of opinion. This happens when both parties to the communication know the facts or assume their existence and the comment is clearly based on those assumed facts and does not imply the existence of other facts in order to justify the comment. The assumption of the facts may come about because someone else has stated them or because they were assumed by both parties as a result of their notoriety or otherwise.

Restatement (Second) of Torts § 566 cmt b.

Musk's comment did not expressly state the underlying facts on which he based his opinion. Accordingly, the issue in the present case is whether, in the words of Section 566, "both parties to the communication [knew] the facts or assume[d] their existence . . . because someone else has stated them or because they were assumed by both parties as a result of their notoriety or otherwise." To again recap the factual background behind Musk's comment, the following relevant tweets were posted after the June 24, 2023 brawl:

*June 25*:

1. TwitterUser#2 posts separate images of the unmasked brawler and Brody and also posts a screenshot of Brody's fraternity page in which Brody indicates he "plans to work for the government" after graduation.

2. Separately, Musk tweets, "Who were the unmasked individuals?"

3. TwitterUser#3 responds to Musk's comment by forwarding to Musk the tweet by TwitterUser#2. The TwitterUser#3 tweet includes both the images of the unmasked brawler and Brody as well as the screenshot from Brody's fraternity page.

4. Musk replies to TwitterUser#3 saying, "Very odd."

20

*June 26*:

5.  TwitterUser#4, a known right-wing influencer, posts the same screenshots posted by TwitterUser#3, headed by the message, "Remember when they called us conspiracy theorists for saying the feds were planting fake Nazis at rallies?"

6.  Musk replies to TwitterUser#4 with the comment, "Always remove their masks."

7.  Brody posts a video on his own Instagram account declaring his innocence.

*June 27*:

8.  TwitterUser#5 posts a tweet stating, "Patriot Front 'White Supremacist' Unmasked As Suspected Fed." Although that post included an image of the unmasked brawler, it did not include an image of Brody and did not include the screenshot of Brody's fraternity page.

9.  Musk responds to the post by TwitterUser#5, stating, "Looks like one is a college student (who wants to join the govt) and another is maybe an Antifa member, but nonetheless a probable false flag situation."

Although Brody is not named in Musk's last comment, "it is not necessary that the individual referred to be named if those who knew and were acquainted with the plaintiff understand from reading the publication that it referred to plaintiff." *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 894 (Tex. 1960); *accord Pecan St. Owners Ass'n v. Mala Vida, LLC*, No. 03-25-00216-CV, 2025 WL 2981633, at *4 (Tex. App.—Austin Oct. 23, 2025, no pet.) (mem. op.). This has become known as the "of and concerning" element of a defamation action. *See, e.g.*, *Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 433 (Tex. App.—Austin 2007, pet. denied). The correct standard for evaluating the meaning of a communication is what a "reasonable reader" would believe:

> The appropriate inquiry in determining what a reasonable reader would believe, for the purposes of libel, is objective, not subjective. *See New Times v. Isaacks*, 146 S.W.3d 144, 162 (Tex. 2004). The question is not whether some actual readers were misled by the publication, as they inevitably will be, but whether the hypothetical reasonable reader could be.

*Harvest House Publishers v. Local Church*, 190 S.W.3d 204, 214 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Whether a plaintiff is referenced in a statement is a question of law. *Klentzman v. Brady*, 456 S.W.3d 239, 254 (Tex. App.—Houston [1st Dist.] 2014), *aff'd*, 515 S.W.3d 878 (Tex. 2017).

Here, Musk's comment did not mention Brody by name but merely referred to "a college student who wants to join the government." We believe a reasonable reader of Musk's comment who had **not** seen the earlier tweets—even a reader who was familiar with Brody— would not have concluded that Musk's comment was referring to Brody. Thus, only readers familiar with the earlier conspiratorial tweets about Brody as allegedly being one of the unmasked brawlers would have had reason to believe that Musk's comment was referring to Brody. In order to satisfy the "of and concerning" element of his defamation action, therefore, Brody must necessarily rely on readers who had in fact seen the earlier tweets.

But because of their knowledge of the earlier tweets, and because of how closely Musk's comment repeated the facts reflected in the prior tweets— i.e., that Brody was a college student who had indicated a desire to work for the government—those same readers would have known the facts underlying Musk's opinion. Given the circumstances, we can conceive of no reason why a reasonable reader of Musk's comment, having knowledge of the relevant facts from the earlier Twitter posts, would have believed that Musk's opinion was based on other, undisclosed facts. We therefore conclude that Musk's comment on Twitter did not imply the existence of undisclosed defamatory facts. Accordingly, Musk's comment falls into the "pure" type of opinion statement described by Section 566.

In addition, the overall context in which Musk's comment was made is an important consideration in evaluating his potential defamation liability, i.e., the type of writing at issue must

22

inform our analysis. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018). It is a matter of common knowledge, we think, that Twitter posts were not known for rigorous factual accuracy. Rather, it was a platform known for free-flowing debate and the expression of uninhibited opinions. The audience reading Musk's comment—users of Twitter—would have been aware of that. In that context, Musk's use of the phrase "looks like . . ." would necessarily have served to alert readers that what followed was his evaluative opinion. At most, we believe Musk's comment could be considered "merely an opinion masquerading as fact." *Id.* at 624.

"A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is." Restatement (Second) of Torts § 566 cmt c. We hold that Brody has not established by clear and specific evidence a prima facie case for each essential element of his defamation claim.

**CONCLUSION**

Having concluded that Musk's comment on Twitter was not actionable in defamation and that Brody has therefore not established by clear and specific evidence a prima facie case for each element of his claim, we hold that the trial court erred in overruling Musk's TCPA motion to dismiss. Accordingly, we reverse the trial court's order denying that motion and remand the case to that court for further proceedings consistent with this opinion.

_____

J. Woodfin Jones, Justice

Before Chief Justice Byrne, Justices Kelly and Jones*

Reversed and Remanded

Filed:   March 20, 2026

*Before J. Woodfin Jones, Chief Justice (Ret.), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).